UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED

MAY 25 2016

CLERK

| | |
|---|---|
| **CHARLES E. SISNEY**, | 4:15-CV-04069-LLP |
| Plaintiff, | |
| vs. | |
| **DENNY KAEMINGK**, IN HIS OFFICIAL CAPACITY AS THE SOUTH DAKOTA SECRETARY OF CORRECTIONS; **DARIN YOUNG**, IN HIS OFFICIAL CAPACITY AS THE WARDEN OF THE SOUTH DAKOTA STATE PENITENTIARY; **SHARON REIMANN**, IN HER OFFICIAL CAPACITY AS AN SDSP DESIGNATED MAILROOM OFFICER; AND **CRAIG MOUSEL**, IN HIS OFFICIAL CAPACITY AS AN SDSP DESIGNATED PROPERTY OFFICER; | REPORT AND RECOMMENDATION ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT<br><br>DOCKET NOS. 67 & 92 |
| Defendants. | |

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................ 1

**FACTS** .............................................................................................. 1

**DISCUSSION** ................................................................................. 15

   A.   Summary Judgment Standard ............................................. 15

   B.   First Amendment ................................................................ 18

      1.   <u>Martinez</u>, <u>Turner</u> and <u>Thornburgh</u> ................................. 19

         a.   <u>Martinez</u> ................................................................ 19

         b.   <u>Turner</u> ................................................................... 20

         c.   <u>Thornburgh</u> .......................................................... 22

      2.   Cases Dealing with South Dakota DOC Pornography Policies ............ 27

         a.   <u>Carpenter v. South Dakota</u> ................................... 27

         b.   <u>Thibodeaux v. South Dakota</u> ................................ 29

i

c.  King v. Dooley .................................................................... 30

d.  Salinas v. Janklow ............................................................. 32

e.  Kaden v. Slykhuis ............................................................... 33

f.  Hughbanks v. Dooley .......................................................... 33

g.  Cochrun v. Weber ............................................................... 35

3.  Facial Challenge to 2015 Version of DOC .............................. 36

a.  Whether King and Salinas are dispositive ......................... 36

b.  Application of Turner Factors to Incoming Mail ................ 43

    i.  Neutrality and Rational Relationship ............................ 45

    ii.  Alternative Means of Exercising the Right .................... 50

    iii.  "Ripple Effects" ............................................................ 58

    iv.  Obvious, Easy Alternatives to Censorship ................... 60

    v.  Summation of Turner Factors ...................................... 61

c.  Application of Martinez to Outgoing Mail ........................ 68

4.  As-Applied Challenge ............................................................ 72

a.  Pretty Face Comic Books ................................................. 74

b.  Thrones of Desire ............................................................ 76

c.  Pride and Prejudice:  The Wild & Wanton Edition ........... 78

d.  Matisse, Picasso, and Modern Art in Paris ...................... 79

e.  Michaelangelo Pictures and Sculptures .......................... 82

f.  Coppertone® Advertisement ........................................... 84

g.  The Exception in the Current DOC Policy ........................ 85

C.  Due Process .............................................................................. 90

1.  Procedural Due Process ........................................................ 90

2.  Vagueness .............................................................................. 91

D.  Official Capacity ....................................................................... 93

**CONCLUSION** ..................................................................................... 97

**NOTICE TO PARTIES** .......................................................................... 98

## INTRODUCTION

Pending before the court is plaintiff Charles E. Sisney's *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging defendants' pornography policies violate his constitutional rights. See Docket Nos. 1 & 8-1. Mr. Sisney is an inmate at the South Dakota State Penitentiary (SDSP) in Sioux Falls, South Dakota. All parties have filed cross-motions for summary judgment. See Docket Nos. 67 & 92. This matter was referred to this magistrate judge pursuant to the October 16, 2014, standing order of the Honorable Karen E. Schreier and 28 U.S.C. § 636(b)(1). The following is this court's recommended disposition of the motions.

## FACTS

Plaintiff Charles Sisney is an inmate at the SDSP, serving a life sentence. He is not a sex offender nor has he ever been disciplined during his tenure as an inmate for any sexual misconduct.

The South Dakota Department of Corrections (DOC) has an anti-pornography policy applicable to its penal institutions. This is DOC policy 1.3.C.8 and it provides in pertinent part as follows:

> The Department of Corrections (DOC) prohibits the purchase, possession, and attempted possession and manufacturing of pornographic materials by offenders housed in its institutions.
>
> * * *
>
> Pornographic Material: Includes books, articles, pamphlets, magazines, periodicals, or any other publications or materials that feature nudity or "sexually-explicit" conduct. Pornographic material may also include books, pamphlets, magazines, periodicals or other publication or material that features, or

1

includes photographs, drawings, etchings, paintings, or other graphic depictions of nudity or sexually explicit material.

Nudity: "Nudity" means a pictorial or other graphic depiction where male or female genitalia, pubic area, buttocks or female breasts are exposed. Published material containing nudity illustrative of medical, educational or anthropological content may be excluded from this definition.

Sexually Explicit: "Sexually Explicit" includes written and/or pictorial, graphic depiction of actual or simulated sexual acts, including but not limited to sexual intercourse, oral sex or masturbation. Sexually explicit material also includes individual pictures, photographs, drawings, etchings, writings or paintings of nudity or sexually explicit conduct that are not part of a book, pamphlet, magazine, periodical or other publication.

Offender: For purposes of this policy, an offender is an inmate (in the custody of the South Dakota DOC institutional system) . . .

See Docket No. 1-2, p. 1.

Under this DOC policy, pornography is contraband. Id. Violation of the DOC policy can result in disciplinary action against an offender and confiscation of the pornography. Id. at p. 2. In addition, violation of the policy constitutes a violation of the STOP Program contract.[1] Id.

The warden of each South Dakota penal institution is authorized to institute procedures at his or her institution to implement the DOC pornography policy. Id. The minimum requirements for those procedures are preventing pornographic materials from infiltrating the institution through correspondence and visits, rejection of all incoming or outgoing pornography,

---

[1] STOP is a DOC sex offender program provided at SDSP (among other institutions), to assist the offender with attitudes and behaviors necessary to return to the community and prevent further sex offending behaviors. See DOC Policy 1.4.A.3, p. 2. Mr. Sisney is not a sex offender.

2

designating staff who will have authority to determine what is pornographic, and creating a system for sharing and coordinating information about pornography between South Dakota penal institutions.  Id.

If an offender disagrees with the institution's decision that a particular item is pornography, he may appeal the decision through the administrative remedy process.  Id.  See DOC policy 1.3.E.2.[2]  Prison staff are prohibited from knowingly bringing pornography into a DOC facility.  See Docket No. 1-2 at p. 2.  The DOC pornography policy is reviewed yearly; sometimes the policy is amended or modified as part of that annual review, and sometimes no changes are made.  Id. at p. 3.  Mr. Sisney filed his complaint with this court on April 8, 2015.  See Docket No. 1.  He attached the version of DOC pornography policy in effect at that time, having been approved following annual review on June 10, 2014.  See Docket No. 1-2 at p. 3.  No changes to the policy were made in 2014, so the version in effect in 2014 is the same as the version finally approved in May, 2013.  Id.

The DOC's policy addressing correspondence also contains some provisions touching on pornography.  See Docket No. 69-2.  Under the DOC mail policy, all outgoing mail must be delivered to the mailroom in unsealed

---

[2] The DOC Administrative Remedy Policy requires an inmate to follow a two-step process if he wishes to initiate a complaint concerning the application of any administrative directive, policy, unit rule or procedure or if he wishes to complain about any oversight or error affecting him.  See Docket No. 69-2, DOC Policy 1.3.E.2.  First, the inmate submits an Informal Resolution Request (IRR).  Id.  If the issue is not resolved within 10 days of filing the IRR, the inmate must file a Request for Administrative Remedy (AR).  Id.  An inmate must initiate his administrative complaint within 30 days of the date of the incident.  Id.

envelopes and is subject to inspection and reading.  Id. at p. 7, ¶ 5-B.
Pornography in incoming or outgoing mail may be rejected.  Id. at pp. 8-9,
¶ 8-A-2 and 8-A-12.

 Mr. Sisney's complaint alleges both facial challenges and as-applied
challenges to the DOC pornography policy.  See Docket No. 8-1.  His claims are
as follows:

 1. Count I—the DOC policy is unconstitutional on its face because it
violates Mr. Sisney's constitutional right to receive sexually explicit
communications.

 2. Count II—the DOC policy is unconstitutional on its face because it
violates Mr. Sisney's constitutional right to send out sexually explicit
communications to those in the general public.

 3. Count III—the DOC policy violates the Due Process Clause because
it denies Mr. Sisney the right to view incoming materials confiscated pursuant
to the policy in order to appeal such confiscations and to defend himself at
disciplinary proceedings.

 4. Count IV—the DOC policy is unconstitutional as applied because
SDSP interprets the policy in an overly broad and exaggerated way to ban
materials that are not pornographic.

 5. Count V—defendants' rejection of seven specific publications which
were to be delivered to Mr. Sisney violates his constitutional rights under the
First, Fifth and Fourteenth Amendments.  The items are:

   •Pretty Face Vol. 3 (ISBN 13: 978-1-4215-1370-6)

4

- <u>Pretty Face</u> Vol. 4 (ISBN 13: 978-1-4215-1547-2)

- <u>Pretty Face</u> Vol. 5 (ISBN 13: 978-1-4215-1644-8)

- <u>Pretty Face</u> Vol. 6 (ISBN 13: 978-1-4215-1645-5)

- <u>Thrones of Desire</u> (ISBN 978-1-57344-815-4)

- <u>Pride and Prejudice:  The Wild and Wanton Edition</u> (ISBN 13: 978-1-4405-0660-4)

- <u>Matisse, Picasso and Modern Art in Paris</u> (ISBN 978-0-917046-88-9)

6.    Count VI-- defendants' rejection of nine specific pictures which were to be delivered to Mr. Sisney violates his constitutional rights under the First, Fifth and Fourteenth Amendments.[3]  The pictures are:

- Paradise by Michelangelo—<u>see</u> Docket No. 40-2

- The Expulsion from the Garden by Michelangelo (Sistine Chapel ceiling painting, bay 4)—<u>see</u> Docket No. 40-3

- Statue of David by Michelangelo—<u>see</u> Docket No. 40-4

- Bronze The Creation of Adam and Eve by Lorenzo Ghiberti—<u>see</u> Docket No. 40-5

- The Fall and Expulsion from the Garden of Eden by Michelangelo (Sistine Chapel ceiling painting)—<u>see</u> Docket No. 40-6

- Study of the Resurrection of the Dead by Michelangelo—<u>see</u> Docket No. 40-7 p.1

- Paradise Bronze by Michelangelo—<u>see</u> Docket No. 40-7 at p. 2

---

[3] Although Mr. Sisney's complaint says nine pictures were attempted to be sent to him, and his mother's affidavit accompanying the filing of the pictures also recites the number nine, in actuality ten pictures were filed with the court.  All ten are listed.  Defendants did not photocopy the pictures before sending them back to Mrs. Sisney, but they believe the pictures filed by Mrs. Sisney in this case are the same ones they rejected.  <u>See</u> Docket No. 70-17 at p.4, ¶ 10.

5

- Paradise painting by Michelangelo—<u>see</u> Docket No. 40-8

- The Last Judgment by Michelangelo (Altar wall Sistine Chapel)— <u>see</u> Docket No. 40-9.

- Coppertone® suntan lotion girl advertising—<u>see</u> Docket No. 40-10.

These ten pictures were sent to Mr. Sisney by his mother, Esther Sisney, twice. The first time, in May, 2015. <u>See</u> Docket No. 91 at p. 2-3, ¶¶ 7-12; Docket No. 40. In May, 2015, the DOC employee who rejected the photos as pornographic was Jordan Storevik. <u>See</u> Docket No. 70-17. Esther Sisney then attempted to send the same pictures to Mr. Sisney again in November, 2015. <u>See</u> Docket No. 91 at p. 2-3, ¶¶ 7-12. In November, 2015, the DOC employee who rejected the photos as pornographic was defendant Sharon Reimann. <u>Id.</u>; <u>see also</u> Docket No. 91-3, Rejection Notice dated November 3, 2015, signed by defendant Reimann.

The rejection notices for all of the above items is a check-the-box form. <u>See e.g.</u> Docket No. 91-3. All of the rejection notices for the above items had the box checked for the following formulaic description:

> The item depicts pornographic material or encourages sexual behavior, pornography, nudity or sexually explicit conduct which is criminal in nature and/or may be detrimental to your rehabilitation. Included in this item are pictures, photographs, drawings, etchings, paintings, writings or illustrations depicting or describing sexual behavior, pornography, nudity, sexually explicit conduct, child pornography, bestiality or acts of sexual violence.

<u>See id.</u>

When the first <u>Pretty Face</u> book was rejected, Volume 4, the response to Mr. Sisney's request for an informal resolution stated that the book was

6

rejected "because there was nudity in several areas of the book.  It also has a parental advisory on the cover.  You cannot have this item."  See Docket No. 68-5.  When Mr. Sisney's request for an administrative remedy was denied, defendant Young stated "the book does contain sexually explicit drawings and storylines."  See Docket No. 68-7.  Volumes 3, 5, and 6 of Pretty Face were different books rejected at different times than Volume 4, addressed above. See Docket Nos. 68-8 (Vol. 3 Rejection Notice dated March 10, 2015); 68-13 (Vol. 6 Rejection Notice dated March 11, 2015); 68-18 (Vol. 5 Rejection Notice dated March 12, 2015).  Although these were all separate books, delivered separately, when Mr. Sisney filed his administrative grievances for each book, defendants did not address the merits of those grievances at the initial review level; instead, each grievance was initially rejected on the grounds that Mr. Sisney had "already grievance [sic] this issue and are only allowed to grievance [sic] this issue once.  Your request has been denied."  See Docket Nos. 68-10, 68-15, and 68-20.  On appeal from the initial review level, however, defendant Young appears to have addressed the merits of the grievance.  See Docket Nos. 68-12, 68-17, and 68-20.  Defendant Young rejected all four volumes on the basis of sexually explicit drawings and storylines.  Id.

The three books, Thrones of Desire, Pride and Prejudice:  The Wanton Edition, and Matisse, Picasso and Modern Art in Paris were all delivered together and rejected in one rejection notice.  See Docket No. 69-13.  At the initial IRR level, the explanation provided to Mr. Sisney by defendants for the rejection was "these books violate policy and will not be allowed.  The

explanation of rejection is listed on your rejection notice." <u>See</u> Docket No. 69-15.  Defendant Young, on appeal, rejected the grievance with the following statement:  "All three (3) books you ordered were rejected for sexually explicit content.  Two (2) of the books also have nudity in them." <u>See</u> Docket No. 69-17.

The Michelangelo pictures and the Coppertone® suntan lotion advertisement were all delivered and rejected together.  <u>See</u> Docket Nos. 70-6 and 91-3.  The grievance was denied on the basis that "the photos are clearly nude." <u>See</u> Docket No. 70-8.  Defendant Young denied the appeal of the grievance solely on the basis of the presence of nudity.  <u>See</u> Docket No. 70-10. No mention was made in the denials of the <u>Matisse</u> art book or the Michelangelo pictures that Mr. Sisney was required to be enrolled in an art class in order to receive the material.  <u>See</u> Docket Nos. 69-17 and 70-10.  In fact, the exception to the pornography policy is not mentioned in these, or any other, administrative documents generated by defendants.

Mr. Sisney went through the prison grievance process on each of his as-applied challenges to defendants' actions as well as his facial challenge to the DOC policy itself.

Mr. Sisney filed three rejection notices signed by defendant Reimann in 2013 for materials attempted to be delivered to him.  <u>See</u> Docket No. 1-4 at pp. 5-7.  These notices rejected the June, July, and August, 2013, issues of *Glamour* magazine.  <u>Id.</u>  No claim is asserted in the complaint based on the

8

rejection of *Glamour* magazines sent to Mr. Sisney. The magazines were addressed to Mr. Sisney, as were the rejection notices. Id.

Mr. Sisney also filed declarations from various other inmates at the SDSP setting forth materials defendants allegedly prevented the declarants from receiving. See Docket No. 1-3. The declarants are thirteen different inmates at SDSP who allege various publications were withheld from them at various times. Id. The documents listed range from the *Smithsonian* magazine, *National Geographic* magazine, *Mad Magazine*, various fashion magazines, and medical manuals, to travel publications and gossip magazines such as *U.S. Weekly* and *Island*. Id. One book, Guns, Germs & Steel, by Jared Diamond, was listed as rejected.[4] The dates of the alleged withholdings range from 2004 to 2015. Id. None of the materials allegedly withheld have been provided to the court. Furthermore, none of the declarations pinpoint what page of the publications defendants found violative of the DOC pornography policy. Id. Many of the declarations are vague as to the date on which the rejection occurred. Id.

Additional declarations which are of more relevance were provided by Mr. Sisney in support of his summary judgment briefing. Those declarations are accompanied by the prison administrative documents generated in

---

[4] Guns, Germs & Steel is a Pulitzer-prize winning non-fiction book about why Eurasion civilizations have survived while other societies have perished or failed to thrive. The thesis of the book is that the favorable influence of geography on societies and culture position those social groups to succeed. See http://www.pbs.org/gunsgermssteel/show/index.html . Last checked May 2, 2016.

connection with the prison's censorship.  Thus, as to these rejections, the court's record reflects a specific date of rejection and defendants' administrative explanation for what portion of the publication was found offensive and why.  See Docket Nos. 95-14, 95-15, 95-16, 97 and 98.

These declarations show that Corey De Hoff, an inmate at SDSP, had two magazines rejected by defendants pursuant to the policy.  See Docket No. 97. They were the April, 2016, issue of *Hot Bike* magazine, which was rejected by defendant Reimann on February 2, 2016, for sexually explicit content on page 72 of the magazine.  See Docket No. 97-1.  The other magazine rejected was the March, 2016, issue of *Men's Fitness* magazine, which was rejected by defendant Reimann on February 12, 2016, for a sexually explicit article on page 90.  See Docket No. 97-2.

Jeremy Bauer, also an inmate at SDSP, had two magazines rejected as well.  See Docket No. 98.  Rejected was the March, 2016, issue of *Esquire* magazine, which was rejected by defendant Reimann on February 16, 2016, for sexually explicit content on page 108.  See Docket No. 98-1.  The other magazine of Bauer's which was rejected was the same issue of *Men's Fitness* mentioned above, rejected by defendant Reimann on February 12, 2016, for the same reason stated above.  See Docket No. 98-2.

In addition, Mr. Sisney provided rejection notices signed by defendant Reimann and Jordan Storevik as to inmate Michael Larson rejecting the December, 2015, issue of *Glamour* magazine and the January and December, 2015, issues of *Cosmopolitan* magazine.  See Docket Nos. 95-14 through 95-16.

10

The versions of the DOC pornography policy have changed throughout the years covered by these inmate declarations.  The definition of "pornographic material" was changed in June, 2009, and definitions of "nudity" and "sexually explicit" were added.  <u>See</u> Docket No. 1-2 at p.3.  In June, 2011, the definitions of "pornographic material," "nudity," and "sexually explicit" were expanded.  <u>Id.</u>  In June, 2012, a new provision regarding the STOP contract was added and a new section about incoming and outgoing documents being rejected was added.  <u>Id.</u>  Finally, changes made in May, 2013, altered the definitions of "pornographic materials" and "sexually explicit" and redefined the statement of the conduct prohibited by the policy.  <u>Id.</u>  The rejection notices issued to Michael Larson, Corey De Hoff and Jeremy Bauer were all issued under the current version of the DOC pornography policy because each rejection occurred after May, 2013.  <u>See</u> Docket Nos. 95-14, 95-15, 95-16, 97 and 98.

Defendants apply their policy in an all-or-nothing manner.  If a book, magazine, or pamphlet contains a portion that offends the DOC pornography policy, the entire publication is rejected.  <u>See</u> Docket No. 95-5, p. 8, RFA #2 to Sharon Reimann; Docket No. 95-6, p. 8, RFA #2 response by defendant Reimann.  <u>See also</u> Docket No. 95-5, p. 3, RFA #13; Docket No. 95-6, p. 4, Kaemingk's answer to RFA #13 (defendants refusal to admit that a publication with one or two nude pictures does not "feature" nudity).   No attempt at dissection of the publication is made.  <u>Id.</u>

Prior to June, 2009, the DOC pornography policy banned publications that "feature" pornography and it defined "feature" as containing pornography on a routine and regular basis or promoting itself based upon pornographic content. <u>See</u> Appendix 1. The current DOC pornography policy eliminated the definition of "feature," although the policy still uses the word "feature." <u>See</u> Appendix 2.

Defendants insist their policy is not a complete ban on pornography, that it only bans publications that "feature" pornography. While that is literally true, defendants are equivocal as to the definition of "feature" in the current policy. Defendant Kaemingk states he has no knowledge as to why the definition of "feature" which was previously part of the policy was removed. <u>See</u> Docket No. 95-1, p. 4, Interrogatory No. 5 to Denny Kaemingk; Docket No. 95-3, p. 5, Kaemingk's answer to Interrogatory No. 5. Kaemingk objected to providing a definition of what "feature" means in the current policy. <u>See</u> Docket No. 95-3, p. 6-7.

In a request to admit, defendant Kaemingk "denied" the definition of "feature" in the current DOC pornography policy is the same as the definition of "feature" that was previously explicitly provided in the policy. <u>See</u> Docket No. 95-5, pp. 2-3, RFA #10; Docket No. 95-6, p. 4, Kaemingk's answer to RFA #10. When asked to admit that a publication containing one or two nude pictures did not violate the DOC policy because the publication did not "feature" nudity, Kaeming denied that was true. <u>See</u> Docket No. 95-5, p. 3, RFA #13; Docket No. 95-6, p. 4, Kaemingk's answer to RFA #13.

Mr. Sisney asked defendants in discovery for a list of various magazines and publications which defendants had rejected under the DOC policy since January 1, 2012. <u>See</u> Docket No. 95-2, p. 3-4, Interrogatory # 7 to Defendant Young. Defendant Young refused to answer the interrogatory on the grounds that Mr. Sisney's complaint presented an "as applied" challenge only. <u>See</u> Docket No. 95-5, p. 5, Young's response to Interrogatory #7.

Mr. Sisney also asked Defendant Young whether there are exceptions to the DOC policy; whether any actual exceptions have been made since January 1, 2012; and the circumstances surrounding the actual exceptions made, if any. <u>See</u> Docket No. 95-2 at p. 4-5, Interrogatory #9 to Defendant Young. Defendant Young's answer was that the exception in the policy was "self-explanatory." <u>See</u> Docket No. 95-4 at p. 6, Young's answer to Interrogatory #9. Young ignored the portion of interrogatory number 9 that asked whether any actual exceptions to the policy were recognized by SDSP from January, 2012, to present and, if so, the circumstances surrounding those exceptions. <u>Id.</u> Defendants objected to answering any questions about the rehabilitation opportunities available to inmates in general, or to rehabilitation opportunities available specifically to inmates serving life sentences like Mr. Sisney, reiterating defendants' assertion that only an as-applied challenge was presented by Mr. Sisney's complaint. <u>See</u> Docket No. 95-1, p. 4, Interrogatory # 11 to Defendant Kaemingk; Docket No. 95-3, p. 6-7, Defendant Kaemingk's answer to Interrogatory #11. <u>See also</u> Docket No. 95-5,

13

p. 4, RFA #18 to Defendant Kaemingk; Docket No. 95-6, pp. 4-5, Defendant

Kaemingk's answer to RFA #18.

Mr. Sisney filed an affidavit with his original complaint in this matter.

See Docket No. 1-2. In that affidavit, he recounts a conversation he had on

March 20, 2015, with Corrections Officer ("CO") Hall, who was a chapel officer

at the time. Id. CO Hall told Mr. Sisney s/he works periodically in the mail

room at the SDSP. Id. CO Hall stated mail was rejected as pornography if the

picture showed any type of definition in the breast or groin area, even if the

breast or groin was fully clothed. Id. CO Hall also said mail was rejected as

pornography if an excessive amount of inner thigh, breast or buttock was

shown. Id.

Defendants filed affidavits in connection with the pending summary

judgment motions in which they state generally that the penological interests

served by the current DOC pornography policy are the same interests

discussed in Salinas (which case is discussed in detail below). See, e.g. Docket

No. 70-13, p. 5, ¶ 16 (Affidavit of Catherine Schlimgen, attorney); Docket No.

70-15, p. 5, ¶¶ 15-16 (Affidavit of Denny Kaemingk). Defendant Kaemingk

states in his affidavit that the SDSP has a "zero-tolerance" policy for sexual

abuse/harassment of offenders. See Docket No. 70-15 at p. 5, ¶ 15. He states,

"[t]he introduction of pornography into a correctional environment *could very*

*well* lead to an increase in sexual behaviors committed by offenders." Id.

(emphasis added). These affidavits provided by defendants do not

acknowledge--or address--the changes between the DOC policy at issue in King

14

(also discussed below) and <u>Salinas</u> and the current DOC policy challenged by Mr. Sisney.  <u>Id.</u>

In his complaint, Mr. Sisney seeks declaratory relief as follows:  that the DOC pornography policy is unconstitutional on its face because it bans all sexually explicit material both pictorial and written; that the policy is facially unconstitutional because it bans outgoing pornography; that the policy is unconstitutional as applied because it is interpreted in an overly broad and exaggerated way by SDSP; and that the policy is unconstitutional because it denies offenders a chance to review the material being withheld.  <u>See</u> Docket No. 8-1 at pp. 11-12.  Mr. Sisney also seeks injunctive relief as follows:  ordering defendants to deliver to him the books and pictures listed above and ordering defendants to enforce its pornography policy only against "traditional forms of pornography and obscene materials."  <u>Id.</u>  Mr. Sisney also seeks an award reimbursing him for costs, fees, and expenses incurred in bringing this lawsuit.  <u>Id.</u>   He is not seeking monetary damages.  <u>Id.</u>  All defendants are sued in their official capacities only.  <u>Id.</u> at pp. 1-3.

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

15

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam).  Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. (citing 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRACTICE &

16

PROCEDURE § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.

Though *pro se* litigants like Mr. Sisney are entitled to a liberal construction of their pleadings, Fed. R. Civ. P. 56 remains equally applicable to them.  Quam v. Minnehaha Co. Jail, 821 F.2d 522, 522 (8th Cir. 1987).  The mere fact that both parties have filed cross-motions for summary judgment does not necessarily mean that no genuine dispute of a material fact exists; nor do cross-motions constitute a stipulation to the court's disposition of the case by motion.  Wermager v. Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983); Barnes v. Fleet Nat'l. Bank, 370 F.3d 164, 170 (1st. Cir. 2004).  Rather, cross-motions require the court to evaluate each motion independently and determine whether that movant is entitled to judgment as a matter of law.  C. Line, Inc. v. City of Davenport, 957 F. Supp. 2d 1012, 1024-25 (S.D. Iowa 2013); St. Luke's Methodist Hosp. v. Thompson, 182 F. Supp. 2d 765, 769 (N.D. Iowa 2001).

17

**B.     First Amendment**

Under the First Amendment a private citizen may not be criminally prosecuted for mere possession of obscene material in the privacy of his own home, although *distribution* of obscene material may be prohibited by the state. Stanley v. Georgia, 394 U.S. 557, 568 (1969).  Obscenity is not protected by the First Amendment.  Miller v. California, 413 U.S. 15, 23 (1973).  However, sexually explicit materials *are* protected by the First Amendment.  Stanley, 394 U.S. at 568.  See also Ashcroft v. Free Speech Coalition, 535 U.S. 234, 240 (2002) (holding the First Amendment generally protects non-obscene pornography for non-prisoners); Reno v. Amer. Civil Liberties Union, 521 U.S. 844, 875 (1997) (stating "In evaluating the free speech rights of adults, we have made it perfectly clear that sexual expression which is indecent but not obscene is protected by the First Amendment.").   The allegation that obscene material may provoke the viewer to engage in antisocial behavior, or that indecent material may inappropriately fall into the hands of minors, is insufficient reason to justify a too-broad suppression of free speech.  Reno, 521 U.S. at 875; Stanley, 394 U.S. at 566-67.  Nor can mere possession of obscenity be criminalized as a necessary incident to enforcing laws prohibiting distribution of obscene materials.  Stanley, 394 U.S. at 567.  Were Mr. Sisney a private, free citizen, he would undoubtedly have a right to possess pornographic material.  Reno, 521 U.S. at 875.

However, "incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the

18

considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285 (1948) abrogated on other grounds by McCleskey v. Zant, 499 U.S. 467, 495 (1991).  Courts have struggled over the decades with how to apply the First Amendment's guaranty of freedom of speech in the context of prison life.  The court discusses three important United States Supreme Court decisions below as the foundation for the court's evaluation of the issues presented in this case.

      1.     **Martinez, Turner and Thornburgh**

          a.    **Martinez**

Under Procunier v. Martinez, 416 U.S. 396, 413-14 (1974), the Court held a prison regulation of mail between inmates and noninmates was required to "further an important or substantial governmental interest unrelated to the suppression of expression" in order to satisfy Constitutional mandates. Martinez, 416 U.S. at 413-14.  The means used to further this governmental interest must be "no greater than is necessary or essential to the protection of the particular governmental interest involved."  Id.  In addition, prison officials were required to notify the inmate and the noninmate if they rejected a letter. Id. at 418.  The prison regulation at issue in Martinez allowed censorship of letters that "unduly complain," "magnify grievances," or "express inflammatory political, racial, or religious or other views or beliefs."  Id. at 399.  The regulation allowed censorship of both outgoing and incoming mail.  Id. at 416. As with other areas of the law dealing with prison administration and

19

prisoners' rights, however, the pendulum began to swing in the other direction after Martinez.[5]

### b.  Turner

In Turner v. Safley, 482 U.S. 78, 81-82 (1987), inmates challenged prison regulations which restricted correspondence between inmates at different state prisons.  Correspondence between inmates who were immediate family members was allowed, as was correspondence about legal matters.  Id. at 81.  However, other correspondence could be prohibited if deemed in the best interests of the parties involved.  Id. at 82.  In practice, all inmate correspondence between inmates at different prisons was prohibited if it was not between immediate family members.  Id.

The Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Id. at 89.  The Court rejected the earlier standard applied in Martinez.  Id. at 83.  The reasonable relation test was more appropriate, according to the Turner Court, because separation of powers counseled that the administration of prisons was largely a function of the legislative and executive branches of government.  Id. at 85.  Also, an added degree of deference applied when a federal court was reviewing a state penal system.  Id.  "Running a prison is an inordinately difficult undertaking that

---

[5] See e.g. Wolff v. McDonnell, 418 U.S. 539, 563-65 (1974) (holding due process protections applied to all prison disciplinary procedures), with Sandin v. Conner, 515 U.S. 472, 483-84 (1995) (holding 21 years later that the due process analysis did not apply to prison discipline unless the discipline imposed "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life").

requires expertise, planning, and the commitment of resources," the Court

wrote.  Id. at 84-85.  Also, "the problems of prisons in America are complex and

intractable, and, more to the point, they are not readily susceptible of

resolution by decree." Id. at 84.

      The Turner reasonable relation standard requires the court to evaluate

four factors:

    1.    whether the governmental objective underlying the regulations is legitimate and neutral, and whether the regulations is rationally related to that governmental objective;

    2.    whether there are alternative means of exercising the right that remain open to prisoners;

    3.    what impact the accommodation of the plaintiff's asserted constitutional right will have on others (guards and inmates) inside the prison; and

    4.    whether there are obvious, easy alternatives whose existence show that the regulation in question is not reasonable, but is an "exaggerated response" to prison concerns.

Id. at 89-91.

      The Court upheld the policy barring inmate-to-inmate correspondence.

Id. at 91.  The court accepted defendants' articulation of the need for the ban to

prevent communication about escape plans, assaults, and other violent acts,

especially with regard to prison gangs living at different institutions.  Id.  Also,

the prison in question was used for protective custody and this use would have

been vitiated if correspondence was allowed that leaked information about

inmates in protective custody at the facility.  Id.  The Court also found

defendants' objectives were neutral and reasonably related to the ban.  Id. at

91-92.

21

As to the second factor, the Court noted that inmates' right to freedom of speech was not completely deprived by the ban—that right was only infringed as to "a limited class of other people with whom prison officials have particular cause to be concerned"—i.e. inmates at other prisons. Id. The third factor also favored defendants because core functions of prison administration, safety and internal security would be impacted, leading to less security and less liberty for everyone else, both guards and inmates. Id. at 92.

As to the fourth factor, no easy alternatives to the policy were apparent. Id. at 93. Other similarly-situated prisons had adopted similar policies. Id. And monitoring the content of inmates' correspondence would impose a great burden on prison officials, and could be evaded by the use of jargon or code in letters.[6] Id. The burden of establishing the existence of easy obvious alternatives is on the inmate, not the prison. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 350 (1987).

### c.    **Thornburgh**

The Turner factors were applied two years later in Thornburgh v. Abbott, 490 U.S. 401 (1989). At issue in Thornburg was a federal Bureau of Prisons (BOP) regulation that allowed the prison warden to reject outside publications

---

[6] The Turner Court also decided the question of whether a ban on marriages by inmates was valid. The portion of the Turner decision—not applicable here—dealing with prison regulation of inmate marriages was legislatively impacted by the passage of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc, et seq. After passage of RLUIPA, constitutional claims premised on the First Amendment free exercise of religion clause continue to be governed by the Turner standard, however claimants can now bring a claim under RLUIPA, which imposes a stricter standard on prison regulations affecting religion. See Gladson v. Iowa Dept. of Corrections, 551 F.3d 825, 831-32 (8th Cir. 2009).

22

mailed to a prisoner if the publication was deemed to be detrimental to the "security, good order, or discipline of the institution or if it might facilitate criminal activity." Id. at 403 n.1. The regulations forbid the rejection of a publication "solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant." Id. at 405.

Publications could not be black-listed categorically under the regulation; rather, each issue had to be reviewed separately. Id. Staff of the warden could screen and approve publications, but only the warden could reject a publication. Id. at 406. If the warden rejected a publication, he was required to immediately notify the inmate in writing of the rejection and the reasons therefor, including a reference to the specific part of the publication deemed objectionable. Id. The sender could obtain review of such a decision by the regional director of the BOP; the inmate could submit a grievance of the issue through the prison administrative remedy process. Id. The inmate could review the rejected publication unless allowing such review would "provide the inmate with information of a nature which is deemed to pose a threat or detriment to the security, good order or discipline of the institution or to encourage or instruct in criminal activity." Id.

A program statement was published providing guidance on sexually explicit material. Id. Explicit heterosexual material was ordinarily admissible at BOP facilities. Id. at 405 n.6. Homosexual, sado-masochistic, bestiality, and sexually explicit materials involving children were generally banned. Id. Other explicit material was admissible if it had scholarly, general social, or

23

literary value.  Id.  Homosexual material that was not sexually explicit was admissible, such as publications covering the activities of gay-rights groups or gay religious groups, and literary publications with homosexual themes or references were admissible.  Id.

The Thornburgh Court held First Amendment concerns were implicated—both for the inmates and for the persons sending mail to the inmates—by prison officials' interference with inmates' incoming mail, but that such rights "must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration."  Id. at 407 (quoting Turner, 482 U.S. at 85).  The Court noted many people on the "outside" have an interest in access to those on the "inside" of prisons, but certain such interactions, though "seemingly innocuous to laymen," may pose "potentially significant implications for the order and security of the prison."  Id.  Noting the judiciary was "ill equipped" to administer the "difficult and delicate problems of prison management," the Court held "considerable deference" would be afforded the regulations of prison administrators.  Id. at 407-08.

In adopting its standard of reasonable relation to legitimate penological interests, the Court rejected the Martinez standard which required the state to show that the regulation furthered an important or substantial governmental interest in the least restrictive way.  Id. at 408-09.  The Court held the Martinez standard did not accord "sufficient sensitivity to the need for discretion in meeting legitimate prison needs."  Id. at 410.  In doing so, the Thornburgh Court suggested that a key difference distinguishing the holding in Martinez

24

from the holding in Thornburgh was that the Martinez prison policy affected incoming *as well as outgoing* prisoner mail.  Id. at 411-12.  Outgoing mail addressed to nonprisoners "cannot reasonably be expected to present a danger to the community *inside* the prison" the Court stated.  Id. at 411-12, and 410 n.10.   The Court concluded the Turner standard applied in Thornburgh while the Martinez standard applied to regulations concerning outgoing correspondence.  Id. at 413.

Applying the Turner factors to the regulation, the Thornburgh Court held the prison mail policy was undergird by a legitimate and neutral objective, and that the regulation bore a rational relation to that objective.  Id. at 414.  In discussing this first factor, the Court acknowledged that "neutrality" under Turner was not the traditional notion of content-neutral laws usually discussed in First Amendment jurisprudence.  Id. at 415.  Rather, what Turner neutrality requires is that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression."  Id. (quoting Martinez, 416 U.S. at 413).  Where the prison regulation at issue distinguishes based on content solely because of the "potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in Turner."  Id. at 415-16.  A rational relationship existed between the prison's neutral goal and the means used to enforce that goal—especially because the duty to reject a publication was a nondelegable duty of the warden's and because publications

could not be categorically banned.  Id. at 416-17.  Thus, there would not be
"shortcuts that would lead to needless exclusions."  Id. at 417.

     The second Turner factor—alternative means of exercising the right—also
favored the BOP regulation.  Id. at 417-18.  In this regard, the Court noted that
the "right" at issue was to be defined "sensibly and expansively."  Id. at 417.
Thus, the right at issue in Turner was not the right to communicate with
inmates at other institutions (a very narrow definition), but rather the right to
exercise other means of expression.  Id. at 417-18.  Likewise, in a case
involving participation in a Jumu'ah religious ceremony, the right was
participation in Muslim religious ceremonies, not participation in the exact
ceremony at issue, a Jumu'ah.  Id. at 418 (discussing O'Lone, 482 U.S. at 351-
52).  Here, prisoners remained free to send and receive other forms of mail and
publications.  Id.

     The Thornburgh Court also held the third Turner factor—impact that
accommodation of the right would have on others—to be satisfied.  Id.  Like the
situation in Turner, the Court held that the restricted publications could only
be allowed to circulate in the prison at great cost to the safety and liberty of
other prisoners and guards.  Id.

     Finally, the fourth Turner factor—existence of obvious, easy alternatives
to the regulation—also favored the BOP regulation.  Id.  The plaintiffs in the
suit argued that the warden could just tear out offending pages of publications
and give the remaining publication to inmates; that the warden's all-or-nothing
rejection of publications was an exaggerated response to the threat.  Id. at 418-

19.  Prison officials responded that testimony in the record supported the

conclusion that tearing out portions of publications would create more

discontent among inmates than the current practice.  Id.  The court held where

prison officials' fears about an alternative practice are reasonably founded, the

alternative is not a viable alternative.  Id. at 419.

### 2.   Cases Dealing with South Dakota DOC Pornography Policies

The South Dakota DOC's pornography policy has been a popular subject

of litigation among the male inmates at South Dakota's penitentiaries.  Several

lawsuits challenging the policy in its various iterations have been filed over the

years, including this one.  Before delving into the parties' arguments, it is

helpful to have clearly in mind what the prior cases litigated and what was

decided.

### a.   Carpenter v. South Dakota

At the time the Carpenter lawsuit was filed, the South Dakota Board of

Charities and Corrections had a censorship policy that allowed them to censor

any publication or portion thereof if it "presents a clear and present danger to

security, order and rehabilitation."  Carpenter v. South Dakota, 536 F.2d 759,

760 n.2 (8th Cir. 1976).  If penitentiary officials censored material, they were

required to give notice of the censorship to the inmate, who then had a right to

request a hearing to determine whether the penitentiary's interests of security,

order, or rehabilitation were implicated by the censored material.  Id.  Inmates

of the SDSP filed suit challenging the prison's censorship of mail order

27

catalogues containing "marital aids" and that depicted couples in various sexual poses. Id. at 760, 762.

The district court dismissed the lawsuit as frivolous without requiring defendants to respond to the complaint. Id. at 761. The Eighth Circuit affirmed. Id. at 763. The court acknowledged that nonprisoners have a right to receive sexually explicit materials under the guarantee of freedom of speech provided by the First Amendment. Id. at 761 (citing Stanley, 394 U.S. 557). However, the court also recited the "familiar proposition" that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Id. (quoting Price, 334 U.S. at 285). First Amendment rights survive incarceration so long as those rights are not inconsistent with the citizen's status as a prisoner or "the legitimate penological objectives of the corrections system." Id.

The court applied the Martinez least-restrictive-means test, placing the burden on prison officials to justify the censorship.[7] Id. at 762. The court examined the materials the prisoners had provided from their administrative hearings in the prison and concluded that the censorship was justified. Id. In particular, prison officials had written in those hearings that the "materials would tend to make inmates more unsettled in their surroundings and less capable of availing themselves to the rehabilitation programs." Id. Also, that the "materials would lead to abnormal arousal and tend to lead to deviate

---

[7] Carpenter was decided after Martinez but before Turner, so its application of the Martinez standard was appropriate.

sexual behavior on the part of some inmates." Id.  The prison officials found no

or questionable "literary, educational or moral value in the material" and that

their "primary purpose . . . is for sexual arousal." Id. at 762-63.

The prisoners did not dispute the characterization of the materials at

issue, but argued the materials did not "present a clear and present danger to

the penal institution or its security, order and rehabilitation." Id. at 763.  The

court rejected this argument, holding that the prison's decision that the

materials "would have a detrimental effect upon rehabilitation was well within

the discretion of the board and requires no further review by the courts." Id.

Judge Lay filed a dissent.  Id. at 763-65.  He argued the courts were not

bound by the conclusory allegations of detriment voiced by defendants in the

administrative materials.  Id. at 764.  Judge Lay stated the majority opinion

abdicated the courts' role to investigate whether a constitutional right was

being violated.  Id.  He would have remanded the matter and required

defendants to establish their bases for believing the censored materials were

detrimental in prison.  Id. at 765.

### b.    Thibodeaux v. South Dakota

Floyd Thibodeaux brought a § 1983 suit alleging officials at the SDSP

violated his First Amendment rights by refusing to allow him to receive a

magazine called *Mature*, described by defendants as a "club" magazine

advertising gay life, swinging, swapping, S & M, AC-DC and discipline.

Thibodeaux v. South Dakota, 553 F.2d 558, 559 (8th Cir. 1977).  The district

court, as in Carpenter, had dismissed the complaint as frivolous without

29

requiring defendants to answer.  Id.  The Eighth Circuit held its decision in

Carpenter was not dispositive and reversed.  Id. at 559-60.

The reason proffered by defendants in the administrative hearing for

censoring *Mature* was that the document "had no rehabilitative value."  Id. at

559.  The prison's own censorship standard, however, covered only those

materials that "present a clear and present danger to security, order and

rehabilitation."  Id. at 560.  The fact that *Mature* did not *advance* rehabilitation

was not the same as a finding that *Mature endangered* rehabilitation.  Id.

Calling the censorship board's findings in Thibodeaux's case "deficient," the

court reversed and remanded.  Id.  Carpenter, the court held, stood for the

proposition that the First Amendment allowed prison officials to censor

materials if they had a detrimental effect upon rehabilitation.  Id. at 559.

Because there was no finding by defendants in the administrative hearing that

*Mature* was actually detrimental to rehabilitation, the existing record did not

show that defendants' actions were constitutional.  Id. at 559-60.

### c.   **King v. Dooley**

In King v. Dooley, 4:00-cv-04052-LLP, Docket No. 34 (D.S.D. June 16,

2003), the court examined whether the DOC policy in effect in 1999-2000

violated King's First Amendment rights.  Id. at p. 1.  King argued that

magazines banned pursuant to the policy such as *Out Law Biker, Easy Rider,*

*Penthouse* and *Hustler*, while they contained pornographic material, also

contained written articles relevant to inmate life.  Id.

30

The DOC policy examined in <u>King</u> prohibited pornography defined as: "books, pamphlets, periodicals, or any other publications that graphically feature nudity or sexually-explicit conduct." <u>See id.</u> at Docket No. 31, p. 2, ¶ 6. "Nudity" was defined as "a pictorial depiction where genitalia or female breasts are exposed." <u>Id.</u> "Feature" meant "the publication contains depictions of nudity or sexually explicit conduct on a routine basis or promotes itself based upon such depictions in the case of individual one-time issues." <u>Id.</u> "Sexually explicit" was at that time defined as "a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex or masturbation." <u>Id.</u> at pp. 2-3, ¶ 6.

King's official capacity claims were dismissed because he had been paroled, thus mooting the issue of whether injunctive relief could issue; damages were held unavailable to King for an official capacity claim. <u>Id.</u> at Docket No. 34, pp. 4-5. The court examined the DOC pornography policy under the <u>Turner</u> factors. <u>Id.</u> at pp. 6-9. First, the court found a rational connection between the DOC policy and a legitimate, neutral governmental interest. <u>Id.</u> at pp. 6-8. The governmental interest was security at the prison and rehabilitation of inmates. <u>Id.</u> Pornography in the prison interfered with these twin interests because inmates fought over pornographic materials; the materials found their way into the hands of sex offenders to whom the materials were detrimental; inmates sold, rented and bartered the materials in contravention of other DOC policies; and inmates hid pornographic materials in envelopes marked "legal mail," in the chapel, and in the school. <u>Id.</u> at p. 2.

Second, the court noted alternative avenues of exercising the right to sexually explicit materials were open to inmates. Id. at pp. 8-9. Specifically, the DOC policy did "not ban the receipt of sexually explicit written materials, or provocative, but clothed, depictions of females." Id. at p. 8. The court noted an interpretation of the DOC policy which prohibited depictions of décolletage or photos of partial, but not complete, exposure of female breasts "might not pass constitutional muster." Id. at p. 8 n.5. Because neither party argued the DOC policy went this far, the court reserved the issue of the constitutionality of such a far-reaching ban "for another day." Id.

Third, the King court found allowing inmates access to pornography and imposing the burden of policing such "appropriate" use of pornography on prison officials "would surely drain prison resources." Id. at p. 9. Finally, the court found no ready alternatives to the ban; defendants showed their prior policy of allowing some inmates to possess some pornography was "simply unworkable for security and rehabilitative reasons." Id. Accordingly, every Turner factor being in defendants' favor, the court granted defendants summary judgment on King's complaint. Id. at p. 10.

### d. **Salinas v. Janklow**

In Salinas v. Janklow, 4:99-cv-04204-LLP, Docket No. 28 (D.S.D. June 16, 2003), the court disposed of another challenge to the DOC pornography policy on the same day as King and with identical reasoning. Id. at pp. 7-11. Salinas challenged defendants' denial of access to a pornographic magazine called *Leg World.* Id. at p. 3. He alleged a violation of his First Amendment

32

rights.  Id.  The Salinas opinion incorporated by reference the reasoning from the King opinion.  Id.

### e.    Kaden v. Slykhuis

In Kaden v. Slykhuis, 651 F.3d 966, 967-68 (8th Cir. 2011), the district court had, on initial screening pursuant to 28 U.S.C. §§ 1915 & 1915A, dismissed Kaden's § 1983 suit challenging the DOC policy prohibiting violent media.  At issue was defendants' rejection of a Japanese comic book called Shonen Jump.  Id. at 968.  Applying Turner, the Eighth Circuit remanded.  Id. at 969.  Because defendants had never been required to respond to Kaden's complaint, the court was unable to discern whether defendants' response to the comic book was "appropriate, or an exaggerated response to prison concerns."  Id.  The record after remand indicates that defendants subsequently settled with Kaden and his complaint was dismissed pursuant to the settlement.  See Kaden v. Slykhuis, 4:10-cv-04043-LLP, Docket No. 60 (D.S.D. Apr. 5, 2012).

### f.    Hughbanks v. Dooley

In Hughbanks v. Dooley, 2012 WL 346673 at *1, *14 (D.S.D. Feb. 2, 2012), Hughbanks brought suit against defendants in both their individual and official capacities, alleging the DOC pornography policy—as applied—violated his First Amendment rights.  At issue was defendants' rejection of two books, Dirty Spanish and The Quotable Bitch.  Id.  The court examined Hughbanks' as-applied challenge under the May, 2011, DOC pornography policy.  See Hughbanks, 4:10-cv-04064-KES at Docket No. 61-2.

33

The court dismissed Hughbanks' official capacity claims, holding that Hughbanks had not alleged sufficient facts to show a policy or custom on the part of defendants. Id. at *14. The two incidents alleged by Hughbanks involving the two identified books were insufficient to establish a policy or custom. Id. Alternatively, the court held if Hughbanks could show the Secretary of the Department of Corrections was involved in the rejection of his books, he might establish the requisite policy or custom because the Secretary's action would be "taken by the highest officials responsible for setting policy." Id. at *15. However, Hughbanks never alleged the Secretary was involved in rejecting the books. Id.

As to Hughbanks' individual capacity claims, the court applied the Turner factors. Id. at **17-20. Defendants argued Dirty Spanish was sexually explicit. Id. at *18. Applying a definition of "sexually explicit" that was substantially similar to the definition applicable in Mr. Sisney's case, the court agreed.[8] The court found prohibiting Hughbanks access to this depiction was

---

[8] The definition of "sexually explicit" in the DOC policies is as follows. Words which appear in Mr. Sisney's version of the DOC policy are underlined and did not appear in the Hughbanks version of the policy:

"Sexually explicit" includes written and pictorial, graphic depiction of actual or simulated sexual acts including but not limited to sexual intercourse, oral sex or masturbation. Sexually explicit material also includes individual pictures, photographs, or drawings, etchings, writings or paintings of nudity or sexually explicit conduct that are not part of a book, pamphlet, magazine, periodical or other publication.

Compare Docket No. 1-2 with Hughbanks, 4:10-cv-04064-KES, Docket No. 61-2. The example of a "sexually explicit" depiction from Dirty Spanish was a man burying his face in a woman's cleavage, with both parties fully clothed and the caption, "Could I motorboat your . . . ?" Hughbanks, at *18.

reasonably related to the underlying penalogical goal of security, order and rehabilitation.  Id.  Regarding The Quotable Bitch, the court rejected defendants' assertion that it was sexually explicit, but agreed that portions of the book were not conducive to Hughbanks' rehabilitation as a sex offender. Id. at *19.

As to the second Turner factor, the court found alternative means of exercising Hughbanks' First Amendment rights were available because he could obtain a Spanish grammar book that was not sexually explicit and there were other books in the prison library available to him.  Id.  The court found the third Turner factor in defendants' favor because they alleged, and Hughbanks did not contradict, that allowing sexually explicit materials into the prison would be detrimental to prison security and order.  Id.  The fourth Turner factor of "ready alternatives" was decided in defendants' favor because Hughbanks did not articulate any ready alterntives.  Id.  The court then granted summary judgment to defendants on Hughbanks' First Amendment as-applied challenge to the DOC pornography policy.

### g.   Cochrun v. Weber

Dean Cochrun, an inmate at the SDSP, filed a § 1983 lawsuit April 13, 2012, which, in Count VII, challenged the DOC's pornography policy.  Cochrun v. Weber, 2012 WL 2885565, at *7 (D.S.D. July 13, 2012).  Cochrun's claim appeared to present a facial challenge to the policy.  See Cochrun v. Weber, 4:12-cv-04071-KES, Docket No. 1 at p. 10.  The district court dismissed this claim upon screening under 28 U.S.C. § 1915, stating only that the court had

already found the SDSP pornography policy to be constitutional in <u>King</u> and

<u>Salinas</u>.  <u>Cochrun</u>, 2012 WL 2885566 at *7.  No discussion or analysis is

contained in the opinion as to changes in the DOC policy between the time

<u>King</u> and <u>Salinas</u> were decided and the time the court was evaluating

Cochrun's claim.  <u>Id.</u>  Cochrun did not file a copy of the then-current DOC

pornography policy with the court.  <u>See</u> <u>Cochrun v. Weber</u>, 4:12-cv-04071-KES.

The policy does not otherwise appear of record in the case.  <u>Id.</u>

### 3.    Facial Challenge to 2015 Version of DOC

#### a.    Whether <u>King</u> and <u>Salinas</u> are dispositive

Defendants herein argue this court should not entertain Mr. Sisney's

facial challenge to the DOC pornography policy in effect when this lawsuit was

filed.  They argue this court has already decided the DOC pornography policy is

facially valid in <u>King</u> and <u>Salinas</u>, and the current policy is "essentially the

same" as the policy approved of in <u>King</u> and <u>Salinas</u>.  <u>See</u> Docket Nos. 70-13 at

p. 3, ¶9; 70-15 at p. 3, ¶ 8.  Mr. Sisney resists this argument, stating the

policy has substantially changed since those decisions.

The <u>King</u> and <u>Salinas</u> decisions were authored by this district in 2003

concerning a DOC pornography policy effective as of April 1, 2000.  <u>See</u> <u>King</u>,

4:00-cv-04052-LLP, Docket No. 32-1.  Mr. Sisney's complaint concerns a DOC

pornography policy effective as of June 10, 2014.  <u>See</u> Docket No. 1-1 at p.1.  A

side-by-side comparison of the two policies is as follows:

36

| SISNEY DOC POLICY<br><br>See Appendix 2 | KING DOC POLICY<br><br>See Appendix 1 |
|---|---|
| **Policy** | **Policy** |
| The Department of Corrections (DOC) prohibits the purchase, possession and attempted possession and manufacturing of pornographic materials by offenders housed in its institutions. | The Department of Corrections prohibits the purchase, possession and attempted possession of pornographic materials by inmates housed in South Dakota Department of Corrections institutions.<br><br>This version of policy 3C.5 supercedes the Feb. 29, 2000 version of policy 3C.5. |
| **Definitions** | **Definitions[9]** |
| **Pornographic Material:** Includes books, articles, pamphlets, magazines, periodicals, or any other publications or materials that feature nudity or "sexually explicit" conduct. Pornographic material may also include books, pamphlets, magazines, periodicals or other publication or material that features, or includes photographs, drawings, etchings, paintings, or other graphic depictions of nudity or sexually explicit material.<br><br>**Nudity:** "Nudity" means a pictorial or other graphic depiction where male or female genitalia, pubic area, buttocks or female breasts are exposed. Published material containing nudity | **Pornographic Material:**  Books, pamphlets, magazines, periodicals, or any other publications that graphically feature nudity or sexually-explicit conduct.<br><br>**"Nudity"** means a pictorial depiction where genitalia or female breasts are exposed.<br><br>**"Features"** means that the publication contains depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues.<br><br>Publications containing nudity illustrative of medical, educational or |

---

[9] In the 2000 version of the DOC policy examined in King, the only definition set out in boldface type was "pornographic material."  The other terms defined in the King policy were merely set off by quotation marks.  To facilitate comparison between the two policies, the court added boldface to the other terms defined in the King version and also set them off with a stand-alone sentence.  Other than these cosmetic changes, no other changes were made.

| | |
|---|---|
| illustrative of medical, educational or anthropological content may be excluded from this definition. | anthropological content may be excluded from this definition. |
| **Sexually Explicit:**<br>"Sexually Explicit" includes written and/or pictorial, graphic depiction of actual or simulated sexual acts, including but not limited to sexual intercourse, oral sex or masturbation. Sexually explicit material also includes individual pictures, photographs, drawings, etchings, writings or paintings of nudity or sexually explicit conduct that are not part of a book, pamphlet, magazine, periodical or other publication. | **"Sexually Explicit"** means a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex or masturbation.<br><br>Pornographic material also includes individual pictures, photographs, or drawings of nudity or sexually explicit conduct that are not part of a book, pamphlet, magazine, periodical or other publication. |
| **Offender:**<br>For purposes of this policy, and offender is an inmate (in the custody of the South Dakota DOC institutional system), a Community Transition Program parolee or detainee (See DOC policy 1.5.G.2 *Community Transition Program*), or a juvenile housed at the State Treatment And Rehabilitation (STAR) Academy. | |
| **Procedures:** | **Procedural Guidelines:** |
| **1.  Purchase, Possession and/or Attempted Possession of Pornographic Material:**<br><br>A.  Any pornographic material is considered contraband.<br><br>B.  The purchase, possession, attempted possession or manufacturing of pornographic material by an offender is a violation of certain Offenses in Custody (See DOC *Inmate Living Guide* and STAR OM 5.3.C.1 *Youth Standards of Conduct* | **I.  Purchase, Possession and/or Attempted Possession**<br><br>A.  Any pornographic material is considered contraband.<br><br>B.  The purchase, possession and/or the attempted possession of pornographic material by an inmate is a violation of Prohibited Act 3-18.<br><br>    1.  Any inmate who violates the procedures in this policy is subject to disciplinary action (See DOC Policy 3C.3 Inmate Discipline System). |

1.  Any offender found in violation of this policy may be subject to disciplinary action (See DOC policy 1.3.C.2 *Inmate Discipline System* or DOC policy 1.3.C.3 *Juvenile Discipline System*).

2.  Materials are believed to be in violation of this policy may be confiscated and used as evidence during the disciplinary process.

3.  Additionally, the purchase, possession, attempted possession or manufacturing of pornography by a sex offender is a violation of the STOP Program contract (See DOC Policy 1.3.C.9 *Sex Offender Restrictions*).

**2. Institutional Guidelines:**

A.  Each institution's Warden/Superintendent will ensure procedures are in place to prevent pornographic material from being brought into the institution(s) under their authority.  Such procedures will encompass at a minimum:

1.  Prevention of pornographic material through correspondence and visits (See DOC policy 1.5.D.1 *Inmate Visiting*, 1.5.D.2 *Juvenile Visitation and Telephone Contact* and 1.5.D.3 *Offender Correspondence*).

a.  [sic] All incoming and outgoing correspondence or publications depicting pornography or containing pornographic material will be rejected (See DOC policy 1.5.D.3 *Offender Correspondence*).

2.  Designated staff who have the authority to determine if a particular

2.  Materials that are believed to be in violation of this policy may be confiscated and used as evidence during the disciplinary process (See DOC Policy 3C.3 Inmate Discipline System).

C.  Staff will not knowingly bring pornographic material into a facility.

D.  Each adult facility will promulgate procedures to ensure that pornographic material is not allowed into their facility.  Such procedures will include, at a minimum:

1.  Specific reference to operations memorandums on correspondence and visiting;

2.  The appointment of a single staff member to determine if a particular item is included in the definition of pornographic material; and

3.  The requirement that decisions made under section D.2 be shared, coordinated and consistent with the decisions made regarding the same or similar material in the other adult facilities of the SD DOC.

item is included in the definition of pornographic material.

3.  A procedure/system in place to allow each institution/unit to share and coordinate information regarding pornography in the effort to keep standards consistent between institutions.

B.  If an offender disagrees with the decision that a particular item meets the definition of pornographic material, he/she may appeal the decision through the administrative remedy process (See DOC policy 1.3.E.2 *Administrative Remedy for Inmates* or 1.3.E.3 *Juvenile Administrative Remedy Procedure*).

C.  Staff will not knowingly bring or receive pornographic material (see definition) inside a DOC facility or on the grounds of a DOC facility (See DOC policy 1.3.A.10 *Restrictions on Electronic Equipment*).

As can be seen from the above comparison, the current version of the DOC pornography policy is much more sweeping and comprehensive than its predecessor which was analyzed in King.  The current policy prohibits the creation ("manufacture") of pornography where the King policy did not.  The current policy bans any items that "feature" nudity or sexually explicit content whereas the King policy banned only items that "graphically" featured such material.  The King policy defined "features" to mean that nudity and sexually explicit content were contained in the item "on a routine or regular basis" or, if a one-time issue, "promotes itself based upon" nudity and sexually explicit

40

content. The current policy bans all items that "feature" nudity or sexually explicit material regardless of whether that is done routinely, regularly, or whether the product is promoted as featuring such content. No definition of "feature" is contained in the current DOC policy.

Nudity under the current policy added the terms "pubic area," "buttocks," and "male genitalia" to the definition contained in the <u>King</u> policy. The <u>King</u> policy limited "sexually explicit" to pictorial representations, while the current policy includes pictures, written material, and graphic depictions. The <u>King</u> policy defined "sexually explicit" as sexual intercourse, oral sex or masturbation, actual or simulated. The current policy defines "sexually explicit" as those same items, but "not limited to" those items.

Under the <u>King</u> policy, a single staff member at each institution was responsible for determining if a particular item fell within the policy. Under the current policy, multiple staff members may be so designated. The current policy specifies the availability of the prison's administrative remedy procedures for disgruntled inmates who disagree with a decision that an item is pornographic. The <u>King</u> policy did not so specify, but the prison's administrative remedy is of long standing and existed side-by-side with the <u>King</u> pornography policy.

Under the <u>King</u> policy, only the possession or attempted possession of pornography was banned. Under the current policy, the manufacture of pornography is additionally banned. Since inmates may not create written or pictorial pornography ("manufacture" it), it follows that they may not create

41

such items and send them out to persons outside the prison, be they spouses, family members or others.  Thus, the current DOC policy affects outgoing mail as well as incoming mail while the King policy affected only incoming mail.

Interestingly, while society's standards regarding nudity and sexually explicit conduct have become more liberal—or more coarsened, according to one's point of view—over the last 16 years, the SDSP policy has grown more Victorian and strict over that period, rather than being influenced by the mores of the society in which the SDSP exists.  In any event, the above comparison demonstrates that Mr. Sisney has the better argument here:  the policy over which the district court passed benediction in King is substantially different from the current DOC policy the constitutionality of which is at issue here.  Because of the differences between the two policies, neither King nor Salinas is dispositive of the facial constitutionality of the DOC policy at issue here.  The provisions of the policy that existed at the time of King are constitutional under established law; the expansion of those provisions is, at this juncture, an unsettled question.

Defendants rely on Semler v. Ludeman, 2010 WL 145275 (D. Minn. 2010), for the assertion that once the facial validity of the DOC pornography policy was decided, it is decided for all future cases.  The reliance on Semler is unavailing.  In Semler, the court rejected a facial challenge to a pornography censorship policy on the basis of Ivey v. Mooney, 2008 WL 4527792 (D. Minn. 2008), decided just two years earlier.  Semler, 2010 WL 145275 at *8.  There was no evidence before the court the pornography policy in question had

changed in any respect in the intervening two years. Id. Here, 13 years have intervened between the issuance of the decisions in King and Salinas and, as shown above, substantial changes in the policy were made in the intervening period. Semler does not, therefore, stand for the proposition that once a facial challenge is made and rejected the policy can never again be challenged facially.

Defendants also suggest this court, in screening Mr. Sisney's complaint pursuant to 28 U.S.C. § 1915, dismissed his facial challenge to the current DOC policy. Again, Mr. Sisney has the better argument. As he points out, a magistrate judge has no power (absent consent of all parties) to dismiss a claim. See 28 U.S.C. § 636(b)(1)(B). Although this court expressed skepticism regarding Mr. Sisney's facial challenge, no order by the district court was entered dismissing the facial challenge and no report and recommendation was made by this magistrate judge recommending dismissal of the facial challenge. The result is Mr. Sisney's facial challenge is alive and well. The court will therefore address it.

**b.   Application of Turner Factors to Incoming Mail**

The Turner four-factor analysis applies to facial challenges to the constitutionality of a policy affecting incoming mail as well as to as-applied challenges. Bahrampour v. Lampert, 356 F.3d 969, 975 (9th Cir. 2004); Flagner v. Wilkinson, 241 F.3d 475, 484 n.5 (6th Cir. 2001). See also United States v. Reid, 369 F.3d 619, 626 (1st Cir. 2004); Lindell v. Huilbregtse, 205 F. App'x. 446, 448-49 (7th Cir. 2006). To briefly review, the four factors are:

43

1.      Whether the policy is supported by a neutral, legitimate governmental objective and whether that objective is reasonably related to the policy;

2.      Do inmates have alternative means of exercising the right under the status quo;

3.      What are the potential "ripple effects" on other inmates, prison Staff, and prison resources if the right is accommodated; and

4.      Whether there are obvious, easy alternatives to the policy whose existence show that the policy in question is not reasonable, but is an "exaggerated response" to prison concerns.

Turner, 482 U.S. at 89-91.  The court now analyzes these factors as against

Mr. Sisney's facial challenge.

Before doing so, the court notes that that although Mr. Sisney has

brought both facial and as-applied challenges to the DOC policy, the analysis

of the two are not completely distinct.  When interpreting the meaning of a

policy in the context of the facial challenge, it is informative to examine how

prison officials have actually interpreted the policy in the real-life application of

the policy to specific materials.   See Amatel v. Reno, 156 F.3d 192, 195 (D.C.

Cir. 1998) (holding that rather than interpret the statute at issue—the Ensign

Amendment—the court would examine the actual implementing regulations

and the definitions they employed so as to avoid giving an advisory opinion).  It

is especially important to adhere to the real-life interpretation and application

of a policy by prison officials when there is no suggestion in the record that a

warden has or will apply the policy as it *might* be interpreted as opposed to how

it *is* interpreted.  Id.  In the context of a First Amendment facial challenge, such

an approach is necessary to ensure there is a "real and substantial" justiciable

44

controversy rather than a fanciful controversy based on a theoretical interpretation.  Id.  Phrased alternatively, there is no standing to rule on the facial constitutionality of an interpretation of a statute that is not likely ever to be enforced in reality.  Id.  Therefore the court's interpretation of the DOC policy at issue here is guided by the actual language of the policy, as it must be, but also by how defendants have interpreted that policy and applied it in day-to-day life at the SDSP.

### i.    Neutrality and Rational Relationship

A policy is neutral, in the sense that the Turner and Thornburgh Courts defined neutrality, if "the regulation or practice in question . . . further[s] an important or substantial governmental interest unrelated to the suppression of expression." Thornburgh, 490 U.S. at 414 (quoting Martinez, 416 U.S. at 413). Here, there is nothing about the DOC's current policy that would indicate it is related to the suppression of expression.  The governmental interests—security within the prison and ensuring optimal rehabilitation circumstances—are important governmental interests.  As discussed in King, defendants therein stated that bartering pornographic material between inmates, trying to keep pornographic material out of the hands of sex offenders, fights over pornographic material, and potential sexual harassment of female corrections officers were the deleterious effects pornography had or would likely have in the SDSP.  King, 4:00-cv-04052-LLP, Docket No. 34 at pp. 2, 6-8.

Does the current DOC policy bear a rational relationship to those interests?  Insofar as the portion of the policy that was in existence when King

45

and <u>Salinas</u> were decided, the court agrees those portions of the policy are rationally related to the governmental interests. <u>Id.</u>

The portions of the current DOC policy that differ from the policy examined in <u>King</u> are:  the prohibition on "manufacturing" pornography; the inclusion of written sexually explicit materials in the ban; the expansion of "nudity" to include "pubic area," "buttocks," and specifying male genitalia; the elimination of the definition of "feature" as part of the definition of pornography; and the allowance of multiple staff members to screen incoming materials as opposed to a single staff member. <u>Compare</u> Appendix 1 <u>with</u> Appendix 2.  Defendants herein do not recognize nor address these changes to the policy in their affidavits, stating that they are relying on the interests discussed in <u>King</u>. <u>See</u> Docket Nos. 70-13 at p. 5, ¶ 16; 70-15 at p. 5, ¶ 15. Defendant Young offers the additional observation that pornography "could very well" increase sexual behaviors committed by inmates. <u>See</u> Docket No. 70-15 at p. 5, ¶ 15.

Defendants' brief relies exclusively on case law rather than affidavit or other evidence to support the existence of its governmental goals and the relationship of those goals to the policy. <u>See</u> Docket No. 68 at pp. 4-7, 9.  This approach is unhelpful for none of the cases cited by defendants evaluate a policy with the same terms as the DOC policy in this case.  Defendants do not, therefore, state which governmental interests are supported by the current DOC pornography policy in its broadened form nor do defendants state how

46

those governmental interests are rationally furthered by the new, broader provisions.

These changes are not "insignificant," as defendants would have this court hold. Rather, the changes are relatively sweeping. Previously, a publication could only be deemed "pornographic" if it regularly or routinely contained nudity or sexually explicit material. See Appendix 1. Now, publications can be considered "pornographic" on the basis of a single nude depiction in a single issue. See Appendix 2; Docket No. 95-5 at p. 8, RFA #2 to defendant Reimann; Docket No. 95-6 at p. 8, RFA #2 Reimann's response.

Previously, written passages containing sexually explicit descriptions were not banned. See Appendix 1. Now they are. See Appendix 2. Previously, there was no ban on an inmate writing sexually explicit material or drawing pictorial depictions of nudity or sexually explicit material. See Appendix 1. Now there is. See Appendix 2. Although Mr. Sisney concedes that child pornography, bestiality, and sado-masochistic materials have the potential to jeopardize security and the rehabilitation of some offenders, he points out the policy goes far further than banning these obviously deleterious materials. See Docket No. 93 at pp. 6-7. He suggests the policy would result in banning sections of the Bible and Walt Whitman's Leaves of Grass. Id. at p. 7 (citing 2 Samuel 11:1-5; Song of Solomon 7:1-10; Genesis 34:2; Leaves of Grass at p. 127). Clearly, defendants believe nude works of Michelangelo, Matisse, and Picasso are banned under the policy. See Docket Nos. 69-13, 69-15, 69-17, 70-6, 70-10, and 91-3.

The court, left to its own devices, might cast about and conjure up reasons in support of the newer, more sweeping provisions of the DOC pornography policy. However, though the Turner standard is lenient and deferential toward prison officials, it is not "toothless"; it does not contemplate that the court would "go to bat" for defendants and explain the rationale for the pornography policy on their behalves. Salaam v. Lockhart, 905 F.2d 1168, 1171 (8th Cir. 1990). Deference to prison authorities does not mean "that it is appropriate for [courts] to defer completely to prison administrators." Caldwell v. Miller, 790 F.2d 589, 596-97 (7th Cir. 1986). Although an interest in preserving order and internal security in a prison is "self-evident," "prison authorities cannot rely on general or conclusory assertions to support their policies. Id. Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 988 (8th Cir. 2004) (defendants must do more "than merely assert a security concern."). Rather, they must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required as to each point." Walker v. Sumner, 917 F.2d 382, 386 (9th Cir. 1990). See also Murphy, 372 F.3d at 988-89.

Several courts have refused dismissal of a plaintiff's claim on the grounds that defendants did not adequately (or at all) articulate their reasons in support of the policy and how the policy furthered those reasons. See Kaden, 651 F.3d at 967-68; Thibodeaux, 553 F.2d at 559-60. "It is critically

important . . . that the record reveal the manner in which security considerations are implicated by the prohibited activity." Caldwell, 790 F.2d at 597.

In most decisions, prison officials produced affidavits or expert evidence showing the link between the actual terms of the prison policy, the goals of prison administration, and the relation between those goals and the policy. See Bahrampour, 356 F.3d at 972 (affidavits from prison supervisor, superintendent, and expert witness establishing the effect of sexually explicit materials in the Oregon prison); Mauro v. Arpaio, 188 F.3d 1054, 1061 (9th Cir. 1999) (affidavits from female corrections staff that male inmates compared their anatomy to that of nude women in magazines, that inmates invited officers to look at the nude pictures, that inmates asked officers their opinion on shaved genitalia, that inmates masturbated in front of female officers while perusing nude magazines, that an inmate told a female officer he was mentally having anal intercourse with her, and that these types of behavior took place daily to weekly); King, 4:00-cv-04052-LLP Docket No. 32 (detailing incidents at SDSP before pornography policy was adopted to include inmates bartering pornographic magazines, threats related to use or return of such materials, hiding such materials in envelopes marked "legal mail," and hiding such materials in common areas such as the chapel and the school).

It is true that defendants need not produce "sophisticated multiple regression analyses" or "other social science data" to support their beliefs that their policy furthers their goal. Amatel, 156 F.3d at 199. But it is also true

that defendants must articulate some rationale and produce some evidence in support thereof.  See Kaden, 651 F.3d at 967-68; Thibodeaux, 553 F.2d at 559-60.  See also Walker, 917 F.2d at 386; Caldwell, 790 F.2d at 596-97.  They cannot rely on "conclusory statements and post hoc rationalizations for their" policy.  Murphy, 372 F.3d at 988.  Where, as here, defendants do not address the differences between the policy at issue in King and the expansion of the policy before this court at this time, their silence fails to advance their cause. This court concludes the first Turner factor does not favor defendants as to the expansion of the DOC policy beyond what was covered by the King policy.

### ii.    Alternative Means of Exercising the Right

The second Turner factor asks whether inmates have an alternative means of exercising the right in question under the status quo.  Defendants do not address at all the second Turner factor in connection with Mr. Sisney's facial challenge.  See Docket No. 68 at pp. 2-10.

The "right" in question should be defined "sensibly and expansively." Thornburgh, 490 U.S. at 417.  The right should not, however, be defined ridiculously as the right to "read" and to "look at pictures."  In Arpaio, 188 F.3d at 1061, both the district court and the appeals court defined the right in question to be "the right to receive sexually explicit communications."  See also Dawson v. Scurr, 986 F.2d 257, 261 (8th Cir. 1993) (discussing "alternative means" and stating "inmates are allowed to keep many sexually explicit materials in their cells . . . [u]nlike a complete prohibition").  But cf. Amatel, 156 F.3d at 201, 201 n.7, 202 (stating "unless there is some minimum

50

entitlement to smut in prison, the origins of which must be obscure," the failure to allow alternative means of exercising the right "can hardly be fatal"— though the court also acknowledged that the policy at issue allowed inmates to read any written form of "smut" they wished).

In discussing other prison pornography policies, many other courts make clear in context that they also defined the right as the right to receive sexually explicit material, because these courts point to circumstances under which inmates were permitted to view nude or sexually explicit material even under the policy as written. See e.g. Bahrampour, 356 F.3d at 976 (noting inmates could still receive nude publications if the persons depicted pictorially were not engaging in or simulating sexual acts or behaviors); Arpaio, 188 F.3d at 1061 (noting inmates could still receive and send sexually explicit letters and articles and photographs of clothed females); Amatel, 156 F.3d at 201 n.7, 202 (stating prisoners could still enjoy written sexually explicit materials); Dawson, 986 F.2d at 261 (certain inmates could view sexually explicit materials in a reading room and some sexually explicit material would be kept in inmates' cells); and King, 4:00-cv-04052-LLP Docket No. 34 at p. 8 (inmates could read sexually explicit written materials and view provocative, though clothed, pictures).

Defining the "right to be exercised" as the right to receive sexually explicit materials is in keeping with other precedent. In Murchison v. Rogers, 779 F.3d 882, 891 (8th Cir. 2015), the right was defined as the right to read about drug cartels, free press issues in Mexico, and the right to read some content dealing with violence, not the right to simply "read." In O'Lone, the right was defined

51

as the right to practice the Islamic faith, not the right to worship generally or to practice any other type of religion.  O'Lone, 482 U.S. at 351-52.  Similarly, in Murphy, 372 F.3d at 983-84, the right was defined as the right to worship specifically in the Christian Separatist Church Society rather than the right to worship generally.  The regulations in Murchison, O'Lone and Murphy were upheld because, although the inmates were denied the right to exercise their right in some respects (no photographs of murder in Murchison, no group services in Murphy, no Jumu'ah ceremony in O'Lone), the inmates were free to exercise their right to practice their specific reading interest or specific religion in a multitude of other ways.  Murchison, 779 F.3d at 891; O'Lone, 482 U.S. at 351-52; and Murphy, 372 F.3d at 983-84.

Here, the current DOC policy appears to be structured so as to eliminate all forms of nude or sexually explicit materials, whether written or pictorial. See Appendix 2.  In this regard, it is far more sweeping in its scope than any of the policies reviewed in the cases this court has examined.  For example, in Amatel, the BOP regulation therein specifically allowed written sexually explicit materials and allowed certain publications categorically such as *National Geographic*, Our Bodies Our Selves, *Sports Illustrated* (Swimsuit Edition), and the *Victoria's Secret Catalog.*  Amatel, 156 F.3d at 202.  In Bahrampour, inmates could receive nude photos or pictures as long as the persons in the pictures were not engaged in a sexual act or simulating such an act. Bahrampour, 356 F.3d at 976.  In Arpaio, prisoners could still read sexually explicit written material.  Arpaio, 188 F.3d at 1061.  In Dawson, inmates could

52

read and look at sexually explicit materials in a special reading room restricted to those inmates psychologically fit to view the materials; other sexually explicit materials could be kept by inmates in their cells. Dawson, 986 F.2d at 259, 261. See also Smith v. Roy, 2012 WL 1004985 at **2, 10 (D. Minn. Jan. 25, 2012)[10] (banning publications only if they featured nudity or sexually explicit content on a routine basis or promoted themselves based upon such content); Baasi v. Fabian, 2010 WL 924384 at *13 (D. Minn. Mar. 11, 2010), aff'd 391 Fed. Appx. 571 (8th Cir. 2010) (banning only publications that feature nudity or sexually explicit content on a routine basis or promote themselves based upon such content).

The DOC policy at issue here contains no like exceptions. See Appendix 2. Nude photos are not allowed, even if they are a single photo in a multi-page publication. Id.; see also Sisney's RFA #2 to defendant Reimann, Docket No. 95-5 at p. 8; Reimann's Answer to RFA #2, Docket No. 95-6 at p. 8. Sexually explicit writing without any photos or pictures is banned, as are pictorial sexually explicit materials. See Appendix 2. Furthermore, publications are banned even if they do not routinely contain nude or sexually explicit content or promote themselves based on that content. Id.; see also Sisney's RFA #2 to defendant Reimann, Docket No. 95-5 at p. 8; Reimann's answer to RFA #2, Docket No. 95-6 at p. 8.

Defendants point to the fact the policy only bans a publication if it "features" nudity or sexually explicit content, but they clearly testified that they

---

[10] The magistrate judge's report and recommendation in Smith was adopted by the district court. See Smith v. Fabian, 2012 WL 1004982 (D. Minn. 2012).

do not define "feature" to mean routinely contains pornography or promotes itself based on pornographic content. <u>See</u> Docket No. 95-3, p. 6-7; Docket No. 95-5, pp. 2-3, RFA #10; Docket No. 95-6, p. 4, Kaemingk's answer to RFA #10. Defendants have refused to provide a definition of what "feature" now means in the current DOC policy. <u>Id.</u> When asked to admit that a publication containing one or two nude pictures did not violate the DOC policy because the publication did not "feature" nudity, defendant Kaeming denied that was true. <u>See</u> Docket No. 95-5, p. 3, RFA #13; Docket No. 95-6, p. 4, Kaemingk's answer to RFA #13.

Therefore, the court must turn to defendants' application of the policy to determine how they define "feature." <u>Amatel</u>, 156 F.3d at 195. It is clear defendants define "feature" to mean any document that contains even one nude picture, among hundreds of pages, even if that picture is a tasteful piece of art or a cartoon line drawing. <u>See</u> Rejection Notices of <u>Matisse</u> book, Michelangelo pictures, and <u>Pretty Face</u> books; Docket Nos. 68-3, 68-8, 68-13, 68-18, 69-13, 70-6, and 91-3. <u>See also</u> Docket Nos. 1-4 at pp. 5-7; 95-14, 95-15, 95-16, 97 and 98 (all rejecting magazines of general circulation, mostly fashion magazines, for a single objectionable images or article).[11] It is also clear that any form of sexually explicit content, written or pictorial, is banned.

---

[11] The court, where it was able to, looked up each of these magazines and examined the objectionable page. <u>See</u> Order Granting Plaintiff's Motion for *In Camera* Review, filed this same date. Each example did indeed have an image or photo of a bare breast or buttock or contained a sexually explicit writing. In most cases, the rest of the magazine was unobjectionable. Photographs of the objectionable pages which were able to be located are preserved for the record and attached as Appendix 3, filed herewith under seal.

See Appendix 2. Also, it is clear any nude or sexually explicit content in outgoing mail is banned. See Appendix 2 (manufactured pornography banned); Docket No. 69-2 at pp. 8-9, ¶¶ 8-A-2 and 8-A-12 (DOC mail policy 1.5.D.3 explicitly providing defendants may seize any pornography in outgoing mail). Defendants have, in the name of the policy, rejected any number of magazines of general circulation such as *Glamour, Esquire* and *Men's Fitness*. See Docket Nos. 1-4 at pp. 5-7; 95-14, 97-2, 98-1, and 98-2.

The King court upheld the version of the DOC policy in effect at that time in part because inmates had alternative avenues of receiving sexually explicit content:  they could receive sexually explicit written materials and provocative, but clothed, depictions of females. King, 4:00-cv-04052-LLP, Docket No. 34 at pp. 8-9. The King court expressly reserved "for another day" the question whether a complete ban on nude and sexually explicit materials would pass constitutional muster. Id. at p. 8 n.5.

Mr. Sisney asserts that defendants' agent has told him the DOC policy bans pictures of fully clothed breasts or groins if the picture shows "definition." See Docket No. 1-2. He also asserts defendants' agent stated the DOC policy bans any picture that shows an excessive amount of inner thigh, breast or buttock. Id. The court rejects this affidavit of Mr. Sisney's for several reasons. Affidavits submitted in connection with a summary judgment motion must be made upon personal knowledge, set out facts that would be admissible in evidence, and show the affiant is competent to testify on the matters stated. See FED. R. CIV. P. 56(c)(4). The affidavit purports to recite what another

55

person, CO Hall, said, so the information in the affidavit is hearsay which is not generally admissible evidence. [12]   See FED. R. EVID. 802; Miller v. Solem, 728 F.2d 1020, 1026 (8th Cir. 1984) (rejecting affidavit submitted in support of summary judgment motion because it contained hearsay).  Also, the affidavit states CO Hall is the chapel officer; as such, the affidavit does not establish conclusively that Hall is competent to testify to defendants' interpretation and application of the DOC pornography policy in the mailroom.  See Docket No. 1-2.

The affidavit is of little value to the court in the current cross-motions for summary judgment for a final reason:  the affidavit involves a question of law—how to interpret the DOC pornography policy.  That is a question uniquely reserved for the court to determine.  United States v. Picardi, 739 F.3d 1118, 1126 (8th Cir. 2014).  In addition, the interpretation of the policy offered by Mr. Sisney in the affidavit, ostensibly through CO Hall, does not appear to be borne out by the court's examination of the materials defendants rejected in the name of the policy.  For each rejection that the court was able to verify by actually examining the material rejected under the policy, there was indeed a bare breast, buttock, or genitalia or, in the case of written materials, there was

---

[12] The statement by a party's agent offered against that party is definitionally not hearsay.  See Fed. R. Evid. 801(d)(2)(D).  However, the mere fact that an agent made a statement does not establish the existence or scope of the agency relationship.  Id.  Because Mr. Sisney recites the agent, CO Hall, was the chapel officer rather than regular mailroom staff, the affidavit does not conclusively establish Hall's agency for purposes of interpreting the DOC pornography policy.

a writing describing a sex act.[13]  The court has found no instance in which

defendants rejected a publication on the basis of a fully clothed breast, buttock

or genitalia that showed "definition."  The court has found no instance in which

defendants rejected a publication on the basis that an "excessive" amount of

inner thigh, breast or buttock was shown.  For all these reasons, then, the

court holds that Mr. Sisney's affidavit at Docket 1-2 fails to establish the

claimed interpretation of the current DOC pornography policy.

The DOC policy itself contains an exception to the ban for certain "nude"

pictures, but there is no exception for any sexually explicit materials.  See

Appendix 2.  A publication containing a nude picture may be excluded from the

definition of "nudity" if it is illustrative of medical, educational or

anthropological content.  Id.  However, defendants rejected Mr. Sisney's

pictures of scenes from Michaelangelo's Sistine Chapel (more about that in the

as-applied challenge discussed below).  Furthermore, they have taken the

position that only "serious students of the arts" can qualify for the exception

provided in the DOC policy.[14]  Finally, they have steadfastly refused to provide

information about whether rehabilitation resources such as art, medicine, or

anthropology classes are available to inmates at SDSP and, if so, whether

---

[13] See Footnote 11, *supra*.  The court examined as many as it could find of the
materials rejected by defendants but not part of Mr. Sisney's as-applied
challenge.  See Order Granting Plaintiff's Motion for *In Camera* Review filed this
same date.

[14] Defendants state the exception is "self-explanatory."  See Docket No. 95-4 at
p. 6, Young's Answers to Interrogatory No. 9.  Then defendants argue the
exception requires an inmate to be enrolled in a class in order to qualify for the
exception.  The class-enrollment requirement is not stated on the face of the
policy.  The court rejects defendants' assertion that the exception is "self-
explanatory."

inmates such as Mr. Sisney serving life sentences are eligible for such classes. They also refused to answer Mr. Sisney's questions about whether any nude pictures have been allowed to any SDSP inmate since January 1, 2012, under the exception to the DOC policy. Because defendants refuse to provide any information about the exception and whether means are available for inmates to qualify for the exception—except to say the exception is "self explanatory"— the court concludes defendants have failed to show there are circumstances where some inmates may exercise their right to receive sexually explicit material under the status quo.

Defendants, in their summary judgment briefing, do not offer any examples of how inmates may alternatively exercise their right to receive sexually explicit content under the current DOC policy. Instead, they claim there is no such right as the right to receive sexually explicit content. The case law is against defendants on this point. See Ashcroft, 535 U.S. at 240; Reno, 521 U.S. at 875; Stanley, 394 U.S. at 568; Arpaio, 188 F.3d at 1061. Because the court discerns no method of alternatively exercising the right under the status quo, and defendants have offered no alternative means, the court concludes the second Turner factor favors Mr. Sisney.

### iii.    "Ripple Effects"

What impact would accommodation of the right have on the safety and liberty of other prisoners and guards? This is the question the third Turner factor requires the court to consider. Defendants do not address the third

58

Turner factor at all in connection with Mr. Sisney's facial challenge.  See
Docket No. 68 at pp. 2-10.

     The King court upheld the version of the DOC policy at issue in that
case, saying of the third factor that allowing a completely free flow of
pornography into the prison would "surely drain prison resources" as prison
staff attempted to quell fights and keep the materials out of the hands of sex
offenders.  King, 4:00-cv-04052-LLP Docket No. 34 at p. 9.  But what is at
issue here is not the all-or-nothing question of allowing all pornography into
the prison or banning it all.  The King opinion has already settled the question
whether allowing *all* pornography would create undue ripple effects.  Instead,
the question is whether *the expansion* of the DOC policy post-King is necessary
to prevent ripple effects.  Phrased another way, would rejecting the expansion
of the DOC policy which occurred after King create undue ripple effects on the
safety and welfare of other inmates and prison staff?

     Again, the court is stymied in its attempt to analyze this issue by
defendants' refusal to engage in discussion of the issue.  Defendants want to
pretend the DOC policy examined in King is "essentially the same" as the policy
at issue here.  It simply is not.  And defendants do not explain what about the
King policy was unworkable or unsafe such that it fueled the expansion of the
policy to its current form.  The King policy was obviously workable for a
number of years.  Its use of the definition of "features" was in place from 2000
until 2009.  See Docket No. 95-1 at p. 2 Interrogatory #5 to defendant
Kaemingk; and Docket No. 95-3 at p. 5 Kaemingk's answer to Interrogatory #5.

Defendants are silent as to why the definition of features was dropped and the pornography policy extended to apply to publications that do not routinely contain pornography or promote themselves based on such content. Id. Defendants are silent as to why written sexually explicit material is considered dangerous now when it was not banned under the policy in King and why outgoing pornography must be banned as well. The court concludes this third Turner factor favors Mr. Sisney as well.

### iv.   Obvious, Easy Alternatives to Censorship

Defendants do not address the fourth Turner factor at all in connection with Mr. Sisney's facial challenge. The burden of showing easy and obvious alternatives is on Mr. Sisney. O'Lone, 482 U.S. at 350. He argues the easy and obvious alternative was the status quo that previously existed under King: allow written sexually explicit materials, the occasional nude picture or photo if a publication does not regularly and routinely feature nude content, and allow outgoing sexually explicit material. These matters were all permissible under the King policy and, Mr. Sisney argues, they were completely workable, easy, obvious alternatives to the current overly-restrictive policy. The fact the current DOC policy results in the prohibition of magazines of general readership like *Men's Fitness, National Geographic* and pictures of the Sistine Chapel shows, Mr. Sisney argues, that defendants' current policy is an "exaggerated response" to the problems posed by pornography in general in a prison setting. Mr. Sisney readily concedes "traditional" forms of pornography

such as the magazines *Penthouse, Playboy*[15] and *Hustler* should be banned and were banned under the <u>King</u> policy.  He posits allowing fashion magazines like *Glamour* or pictures of the Sistine Chapel to reach prisoners will not create chaos in the prison or negatively affect inmates convicted of sex crimes.  The court agrees on the record before it.

### v.   Summation of <u>Turner</u> Factors

The Eighth Circuit held inmates were entitled to prevail on a First Amendment challenge in <u>Murphy v. Missouri Dept. of Corrections</u>, 814 F.2d 1252, 1256-57 (8th Cir. 1987).  Inmates challenged a prison censorship policy that completely banned materials from the Aryan Nations, an organization with the philosophical or religious belief that the white race is the chosen people of God and that racial integration is wrong or sinful.  <u>Id.</u> at 1254, 1254 n.2.  Prison officials justified the ban because they stated white supremacy literature increased racial tensions and racial unrest in the prison, thereby threatening prison security.  <u>Id.</u> at 1254.  The court rejected this rationale, holding that the ban on Aryan Nations material was more restrictive of inmates' First Amendment rights than was necessary—only literature that advocated violence or was "so racially inflammatory as to be reasonably likely to cause violence" should be banned.  <u>Id.</u> at 1257.

The <u>Murphy</u> opinion from 1987 (as opposed to the <u>Murphy</u> opinion from 2004), must be read with some caution.  The 1987 court applied the old

---

[15] The court notes that *Playboy* no longer contains nude photographs as of last year.  <u>See</u> http://www.cnn.com/2015/10/13/opinions/robbins-playboy-no-more-nudity/ last checked May 4, 2016.

Martinez standard rather than Turner.[16] Id. at 1255-56.  However, the opinion

is still entitled to considerable weight because the governmental interest

asserted by prison officials therein—prison security—has been held by the

Eighth Circuit to be "the most compelling government interest in a prison

setting." Murphy, 372 F.3d at 983 (quoting Goff v. Graves, 362 F.3d 543, 549

(8th Cir. 2004)).  Despite the "most compelling governmental interest" being at

stake, the court still held an all-out ban on the materials at issue violated

inmates' First Amendment rights.  Murphy, 814 F.2d at 1256-57.

There are numerous decisions upholding regulation of pornography in

prisons, but all of the regulations allowed *some* pornography to reach *some*

inmates in *some* form or another.  Arpaio, 188 F.3d at 1061 (allowing sexually

explicit letters between inmates and others, sexually explicit articles, and

suggestive but clothed photos); Amatel, 156 F.3d at 201 (allowing all written

forms of "smut" not barred by the Thornburgh holding); Dawson, 986 F.2d at

259 n.5, 260-61 (psychologically fit inmates could view sexually explicit

materials in special reading room and inmates could have nude materials in

their cells); Smith, 2012 WL 1004985 at **2, 10 (materials with limited nude

depictions allowed so long as they did not routinely contain nudity; written

sexually explicit material allowed as long as it was short and did not

preponderate); Wickner v. McComb, 2010 WL 3396918 at *5 (D. Minn. 2010),

---

[16] The Eighth Circuit decided Murphy on March 19, 1987; the Supreme Court
decided Turner two and one-half months later on June 1, 1987.  Therefore, the
Murphy court was correct in applying the Martinez standard as that was the
applicable law at the time of the decision.

adopted by district court, 2010 WL 3396921 (allowing depictions of buttocks and cleavage as long as anal and genital areas not exposed).

Although "narrow or improbable excesses of a statute are not a ground for invalidation before application shows their reality," Amatel, 156 F.3d at 202, here, the reality of the excesses of the DOC pornography policy have been shown in application. Defendants have used this policy to censor pictures of Michelangelo's paintings, and works by Matisse and Picasso. Therefore, the excesses of the policy are real rather than theoretical.

Because defendants do not specifically address the expansion of their policy after King was decided, they provide no rebuttal to Mr. Sisney's showing. The Eighth Circuit has cautioned the Turner standard is not "toothless"—"[w]e would misconstrue the recent Supreme Court decisions in [Thornburgh], O'Lone, and Turner if we deferred not only to the choices between reasonable policies made by prison officials but to their justifications for the policies as well." Salaam v. Lockhart, 905 F.2d 1168, 1171 (8th Cir. 1990). And the reasonableness test "does not obviate the need for accommodation" of the constitutional right; the "usual prefatory declaration that prisoners retain certain basic constitutional rights has meaning," even post-Turner. Id. at 1171, 1171 n.6.

Rule 56 requires defendants to make a showing by affidavit or other competent evidence that there is no genuine issue of material fact (as to their motion) or that there is a genuine issue of material fact (as to Mr. Sisney's motion), *and* that they are entitled to judgment as a matter of law. See FED. R.

63

CIV. P. 56.  Affidavits submitted in connection with a summary judgment motion must be based on personal knowledge, set forth facts that are admissible in evidence, and show that the affiant is competent to testify to the matters stated.  See FED. R. CIV. P. 56(c)(4).  The United States Supreme Court explained Rule 56 succinctly in Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).  "Rule 56(e) provides that judgment shall be entered against the nonmoving party unless affidavits or other evidence set forth specific facts showing that there is a genuine issue for trial.  The object of this provision is not to replace conclusory allegations of the . . . answer with conclusory allegations of an affidavit."  Id.

"[C]onclusive assertions of ultimate fact are entitled to little weight when determining whether a nonmovant has shown a genuine issue of fact sufficient to overcome a summary judgment motion supported by complying affidavits." Miller, 728 F.2d at 1024 (citing 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure, § 2727 at pp. 157-59 (1983)).  In Miller, the plaintiff opposed the defendants' summary judgment motion with his own affidavit which contained "sweeping conclusory allegations that both defendants intentionally failed to protect him . . ." Miller, 728 F.2d at 1025.  The affidavits he submitted were deficient because (among other reasons) they contained inadmissible hearsay.  Id. at 1026.  The court explained the plaintiff's conclusory allegations were "unsupportable, frivolous, and cannot withstand summary judgment."  Id.  See also, Wells Dairy Inc. v. Travelers Indemnity Co., 241 F. Supp. 2d 945, 956 (N.D. Iowa 2003) ("Hearsay statements which cannot

64

be categorized as a hearsay exception, conclusory allegations, legal arguments, and statements not based on personal knowledge may be stricken.") (citing cases).[17]

Likewise, in <u>Malorana v. MacDonald</u>, 596 F.2d 1072, 1080 (1st Cir. 1979) the plaintiff's affidavits were rejected because the defects were "numerous." <u>Id.</u> The court noted the plaintiff's affidavits were not based on personal knowledge, but instead were based on statements she heard or documents she read, but the properly authenticated transcripts/documents were not attached to the affidavit. <u>Id.</u> Her affidavit contained inadmissible hearsay. <u>Id.</u> And, "[p]articular portions of the counteraffidavits were improper because they purported to examine the defendants' thoughts as well as their actions. Other portions contained impermissible speculation or conclusory language." <u>Id.</u>

---

[17] An extreme example of an improper affidavit is found in <u>Alvariza v. Home Depot</u>, 2007 WL 794416 (D. Colo., March 14, 2007). In that case, the plaintiff claimed she was wrongfully fired because of age discrimination. When the defendant moved for summary judgment, the plaintiff submitted an affidavit in opposition which stated in part:

> (1) Mr. Leo was neither human nor a resource—but that was his job; (2) the older women were left feeling adrift, while other, younger, more attractive people were doted upon by managers who should be trained better; (3) this pattern of sexist remarks is not limited to an isolated instance in an accessible computer room. Mr. Hardy set the tone each and every time he came into the store plaintiff was working. He was on a mission –put out to pasture older women, and hire . . . prettier women—and he let plaintiff know this on a regular basis.

<u>Id.</u> at *6. The court held this affidavit "falls far, far short of the requirements of Federal Rule of Civil Procedure 56 . . ." <u>Id.</u>

65

In <u>Perez v. Volvo Corp.</u>, 247 F.3d 303 (1st Cir. 2001), the sufficiency of the following paragraph from Mr. Gonzalez's affidavit was the subject on appeal:

> Volvo knew about the higher AUM invoice cost figures. From my personal discussions with various Volvo representatives, I know that Volvo was fully aware of the relationship between Trebol and AUM, including the nature and amount of the guarantees.

<u>Id.</u> at 315. The court observed "if admissible, these statements are little short of damning." <u>Id.</u> The statements were not admissible, however, because though they purported to be based on Mr. Gonzalez's personal knowledge, they were "totally lacking in specificity . . ." <u>Id.</u>

> Affidavits purporting to describe meetings or conversations need not spell out every detail, but to receive weight at the summary judgment stage they must meet certain rudiments. Statements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56 . . . even when proffered in affidavit form by one who claims to have been a participant.

<u>Id.</u> (citations omitted). <u>See</u> <u>also</u> James Wm. Moore, et. al. <u>Moore's Federal Practice</u> § 56.14(1)(d) (3d ed. 1997) ("The affidavit, in addition to presenting admissible evidence, must be sufficiently specific to support the affiant's position."). In <u>Perez</u>, the court determined the above language, along with other language in the affidavit was insufficient. <u>Perez</u>, 247 F.3d at 316. "Although these statements purport to deal with Volvo's knowledge of ongoing events, they are conclusory rather than factual . . . such gauzy generalities are not eligible for inclusion in the summary judgment calculus." <u>Id.</u> at 316-17.

A district court may strike speculative and conclusory affidavits from the record. <u>Broughton v. School Board of Escambia County, Florida</u>, 540 Fed.

Appx. 907 (11th Cir. 2013).  In <u>Broughton</u> the district court struck the non-movant's affidavits submitted in resistance to a summary judgment motion which "contained mostly legal conclusions and factual allegations [that] were not based on personal knowledge." <u>Id.</u> at p. 911.  The Eleventh Circuit affirmed, noting "the affidavits . . . simply say [the defendant] lied and mistreated [the plaintiff] without any supporting facts indicating how they arrived at those conclusions.  They therefore do not satisfy the standard Rule 56(c) requires." <u>Id.</u>

In <u>Perez</u>, 247 F.3d at 315, the court explained, however, that the "rule requires a scalpel, not a butcher knife.  The . . . court ordinarily must apply it to each segment of an affidavit, not to the affidavit as a whole." <u>Id.</u>  On a motion for summary judgment, therefore, the district court should disregard only those portions of an affidavit that are inadequate pursuant to FED. R. CIV. P. 56(c), and consider the rest.  <u>Id.</u>

Here, the affidavits offered up by defendants on the subject of the penological goals served by the current DOC pornography policy are conclusory in the extreme.  They do not recognize and discuss the differences between the policy discussed in <u>King</u> and the current policy.  They do not explain if or how the expansion of the pornography policy in its current form is necessary to serve defendants' penological goals.  The affidavits simply substitute defendants' conclusory allegations in their answer with conclusory allegations in their affidavits.  The court will not strike these portions of the affidavits from

the record, but the court concludes they fail to establish genuine issues of material fact.

The court concludes, after evaluation of all the Turner factors, that defendants are not entitled to summary judgment as to the facial constitutionality of the current DOC policy. The court also concludes that Mr. Sisney, for the same reasons, has shown entitlement to summary judgment on his own cross-motion for summary judgment as to the facial validity of the current policy. Accordingly, the DOC policy may be enforced insofar as it comports with the policy approved of in King, but no further.

### c.   Application of Martinez to Outgoing Mail

The prohibition on "manufacturing" pornography contained in the DOC policy facially applies not only to materials created by an inmate and kept within the confines of the prison. To such "in-house" pornography, the above-discussed Turner analysis applies. Thornburgh, 490 U.S. at 412-13. But the prohibition on "manufacturing" pornography also applies to written and pictorial pornography created by an inmate and sent to persons outside the prison. See Appendix 2; Docket No. 69-2 at pp. 7-9, ¶¶ 5-B, 8-A-2, and 8-A-12. To this outgoing pornography, the stricter Martinez test applies. Thornburgh, 490 U.S. at 412-13. This is because "outgoing correspondence from prisoners" does not "by its very nature, pose a serious threat to prison order and security." Id. at 411 and 411 n.10. Under Martinez, censorship of outgoing mail complies with First Amendment principles if it is necessary to "further an important or substantial governmental interest unrelated to the

68

suppression of expression" and the means used to further this interest is "no greater than is necessary or essential to the protection of the particular governmental interest involved." Martinez, 416 U.S. at 413-14.

Here, again, analysis is frustrated by defendants' refusal to acknowledge and address the differences between the King pornography policy and the current DOC policy. Defendants never address the outgoing-component of the current policy. The only governmental interests they articulate are to parrot the interests expressed in King: security, order and rehabilitation. However, because they rely on King and do not tailor their affidavits to the current DOC policy, they never explain what "important or substantial" interest is furthered by censoring *outgoing* pornography. Of course, they also do not explain how the DOC policy is narrowly tailored to serve that governmental interest.

Here, the 1987 Murphy opinion from the Eighth Circuit is directly on point and controls. Reiterating, the court held inmates were entitled to prevail on a First Amendment challenge in which the Martinez standard applied. Murphy, 814 F.2d at 1256-57. Inmates challenged a prison censorship policy that completely banned materials from the white supremacist organization, Aryan Nations. Id. at 1254, 1254 n.2. Prison officials justified the ban on the basis of the threat to prison security. Id. at 1254. The court rejected this rationale, holding the ban on Aryan Nations material was more restrictive of inmates' First Amendment rights than was necessary—that only literature that advocated violence or was "so racially inflammatory as to be reasonably likely to cause violence" should be banned. Id. at 1257. Prison security is described

69

by the Eighth Circuit to be "the most compelling government interest in a prison setting." <u>Murphy</u>, 372 F.3d at 983 (quoting <u>Goff v. Graves</u>, 362 F.3d 543, 549 (8th Cir. 2004)).  Despite the most compelling governmental interest being at stake, the court was still willing to limit prison officials' all-out ban of Aryan Nations' literature.  <u>Murphy</u>, 814 F.2d at 1256-57.  <u>See also</u> <u>Grenning v. Klemme</u>, 34 F. Supp. 3d 1144, 1154, 1159 (E.D. Wash. 2014) (denying summary judgment to defendants on issue of constitutionality of censorship pursuant to a prison policy banning outgoing mail that was sexually explicit).

In <u>Loggins v. Delo</u>, 999 F.2d 364, 365-68 (8th Cir. 1993), the Eighth Circuit applied <u>Martinez</u> to uphold a grant of summary judgment to an inmate whose outgoing letter to his brother included a discussion of a female corrections officer who "enjoyed reading people's mail" and hoped "to read a letter someone wrote to their wife talking dirty . . . so she could go into the bathroom and masturbate."  The court held Loggins was entitled to judgment as a matter of law because the letter did not implicate security concerns within the prison.[18]  <u>Id.</u> at 367.

---

[18] The <u>Loggins</u> court applied <u>Martinez</u> because the censorship at issue was of outgoing mail.  <u>Loggins</u>, 999 F.2d at 365-68.  <u>Loggins</u> was decided July 21, 1993.  <u>Id.</u> at 364.  Approximately six weeks earlier, a three-judge panel of the Eighth Circuit issued <u>Smith v. Delo</u>, 995 F.2d 827 (8th Cir. June 9, 1993).  The <u>Smith</u> court held the <u>Turner</u> factors applied to determine the permissibility of censorship of outgoing mail, over the express objection of Judge Morris Sheppard Arnold.  <u>Smith</u>, 995 F.2d at 830, 832.  This is contrary to <u>Loggins</u>, <u>McNamara</u> and <u>Brooks</u> discussed in the body of this opinion.  Neither <u>Loggins</u> nor <u>Smith</u> has been explicitly overruled.  Other Eighth Circuit decisions after <u>Loggins</u> continue to recite the proposition that the <u>Martinez</u> analysis applies to outgoing mail censorship.  <u>See e.g.</u> <u>Leonard v. Nix</u>, 55 F.3d 370, 374 (8th Cir. 1995).  The court applies <u>Martinez</u> because that approach is consistent with

The <u>Loggins</u> court relied on a Fifth Circuit opinion in which an outgoing letter an inmate wrote to his girlfriend was censored.  <u>See</u> <u>McNamara v. Moody</u>, 606 F.2d 621 (5th Cir. 1979).  The letter stated that a corrections officer who worked in the mail room masturbated while reading mail and "had sex" with a cat.  <u>Id.</u> at 623.  Though the letter was "coarse and offensive," the court held censorship of the letter violated <u>Martinez</u> because there was no evidence it had a deleterious effect on prison discipline or security.  <u>Id.</u>  Although defendants stated the censorship furthered legitimate concerns about prison security and discipline, they produced no evidence of a causal relationship between letters like the one censored and those legitimate concerns.  <u>Id.</u>  The court acknowledged that censorship of outgoing mail may legitimately be had for "escape plans, plans for disruption of the prison system or work routine, or plans for the importation of contraband."  <u>Id.</u> (quoting <u>Martinez</u>, 416 U.S. at 413).  However, the letter in that case did not fall into these categories.  <u>Id.</u>

In <u>Brooks v. Andolina</u>, 826 F.2d 1266, 1267-69 (3d Cir. 1987), the Third Circuit applied <u>Martinez</u> to prison officials' censorship and discipline of an inmate for his outgoing letter to a NAACP coordinator.[19]  The letter complained that a female prison guard searched the inmate's visitor in "a very seductive manner."  <u>Id.</u> at 1267.  The court rejected defendants' asserted "security concerns" as justification for their actions, characterizing that rationale as "merely a belated attempt to justify their actions."  <u>Id.</u> at 1268.

---

the great majority of Eighth Circuit cases and because it is consistent with the Supreme Court's opinion in <u>Thornburgh</u>.

[19] NAACP is the acronym for the National Association for the Advancement of Colored People.

Applying the above law, the defendants are *not* entitled to summary judgment on the facial challenge to the outgoing-mail portion of the DOC pornography policy and Mr. Sisney *is* entitled to summary judgment on that portion of the policy. Loggins, 999 F.2d at 365-68; McNamara, 606 F.2d 623; Brooks, 826 F.2d at 1267-69; Murphy, 814 F.2d at 1256-57; Grenning, 34 F. Supp. 3d at 1154, 1159. Defendants have not shown any evidence that outgoing pornography, whether sexually explicit or nude materials, pose any threat to prison security. Defendants have similarly not shown outgoing pornography poses a threat to the rehabilitation of sex offender inmates or any other inmates. They have failed to show that outgoing pornographic materials increase the harassment or safety of prison corrections officers. Finally, defendants have failed to show the policy as to outgoing mail is narrowly tailored to serve their penological interests. Defendants' complete reliance on King is especially problematic for them here as the King policy did not apply at all to outgoing mail. See Appendix 1.

When a properly supported summary judgment motion is made, it is incumbent upon the nonmoving party to respond to facts asserted by the moving party with affidavits or other evidence disputing the facts in support of the motion. See FED. R. CIV. P. 56(c) and (e). Defendants failed to rebut Mr. Sisney's assertion of facts concerning outgoing mail.

### 4.    As-Applied Challenge

The issue presented at the summary judgment stage is whether a jury could reasonably conclude that defendants herein had legitimate reasons to

72

apply the DOC pornography policy to the particular materials in Mr. Sisney's case. <u>Hargis v. Beauchamp</u>, 312 F.3d 404, 410-11 (9th Cir. 2002). "A regulation valid and neutral in other respects may be invalid if it is applied to the particular items in such a way that negates the legitimate concerns." <u>Murphy v. Missouri Dept. of Corrections</u>, 372 F.3d 979, 986 (8th Cir. 2004). There are six discrete items or categories of items at issue:  (1) the four <u>Pretty Face</u> comic books; (2) <u>Thrones of Desire</u>; (3) <u>Pride and Prejudice: Wild and Wanton Version</u>; (4) <u>Matisse, Picasso and Modern Art in Paris</u>; (5) the Michaelangelo pictures from the Sistine Chapel; and (6) the Coppertone® suntan lotion advertisement.

Mr. Sisney has placed evidence before the court that other inmates were denied receipt of certain materials because of the DOC policy.  <u>See</u> Docket Nos. 1-3, 95-14, 95-15, 95-16, 97, and 98.  In an as-applied challenge, Mr. Sisney can assert only his own constitutional rights, not those of other inmates. <u>McGowan v. Maryland</u>, 366 U.S. 420, 429 (1961); <u>Minnesota Majority v. Mansky</u>, 708 F.3d 1051, 1059 (8th Cir. 2013); <u>Hodak v. City of St. Peters</u>, 535 F.3d 899, 906 (8th Cir. 2008).  Therefore, for purposes of the as-applied challenge, the court does not consider the declarations from other inmates. Also, because Mr. Sisney has not demonstrated that defendants censored any *outgoing* pornography which he attempted to send out of the SDSP, the as-applied challenge relates only to that portion of the DOC policy applicable to *incoming* mail.  Therefore, the <u>Turner</u> analysis, not the <u>Martinez</u> analysis,

applies.  Murphy, 372 F.3d at 986; Bahrampour, 356 F.3d at 975; Flagner v. Wilkinson, 241 F.3d 475, 484 n.5 (6th Cir. 2001).

When evaluating an as-applied challenge to a regulation censoring incoming mail, prison officials are required to "review the content of each particular item received."  Id.  The court is required to "conduct an 'independent review of the evidence' to determine if there has been 'an exaggerated response to prison concerns' in relation to [each] particular item."  Murphy, 372 F.3d at 986 (quoting Williams v. Brimeyer, 116 F.3d 351, 354 (8th Cir. 1997)).  Accordingly, the court now turns to the items in question.

### a.    **Pretty Face** Comic Books

Mr. Sisney argues these four books are rated to be age-appropriate for fourteen-year-olds and, thus, do not fall within the DOC pornography policy.  He also argues the brief scenes of nudity are simple line drawings and not realistic depictions of nudity.  Defendants point to various sections of the books they consider to be covered by the DOC policy.  See Docket No. 69-5 through 69-12.  Mr. Sisney provided (through his mother, Esther Sisney), the entirety of the four books.  See Docket No. 88.

The cover of each book bears a "Parental Advisory" that the books contain "Mature Content."  See box accompanying Docket No. 88.  The books instruct the reader that they read from right to left instead of from left to right.  Id.  Some, but not all, of the pages bear page numbers.  Id.  The books are about a teenaged boy who gets a female face transplant after a motor vehicle accident and is living life as a teenaged girl at a girls' high school.  Id.  Book 3

74

contains approximately 200 pages, mostly filled with sophomoric close-shave situations where the boy is nearly found out to be a boy or gets to hug girls. Id.  On page 142 a man tries to sell the boy a pair of fake silicone breasts he can affix to his person.  Id.  The breasts are depicted bare with exposed nipples, but they are a torso only.  Id.  On page 155, the boy is trying out an all-body female suit covered with a skimpy one-piece bathing suit when a snake attacks him, crawling between the (covered) breasts of the suit.  Id.  The "snake" is drawn to look suspiciously like a penis.  Id.  The "girl" is subsequently pictured holding a limp "snake" dripping some liquid.  Id.  These two examples fit the DOC policy definition of "nudity" and "sexually explicit" (mimicking a sex act).  Id.

This book clearly runs afoul of the current DOC policy because it contains some nudity and some sexually explicit depictions.  See Appendix 2. Books 4, 5 and 6 are of similar ilk.  There are examples in all three books of material that fits the current DOC definition of pornography in an overall book of approximately 200 pages where pornographic images do not preponderate.

The Turner analysis is similar to the above-discussed facial challenge. Defendants have not addressed their penological goals and the reasonable relation of those goals to the expansion of the pornography policy post-King. There are no alternative methods for Mr. Sisney to exercise his right to receive sexually explicit communications.  Defendants do not address the ripple effects inherent in going back to the old King policy.

As to whether defendants' response is an exaggerated response, the court notes that the <u>Pretty Face</u> books present a close question.  The court has already held the current DOC policy is invalid facially, but that the policy may be enforced as far as the <u>King</u> policy would have allowed.  The court concludes that the <u>Pretty Face</u> books would have been censored even under <u>King</u>.  Although individual nude images and depictions of sexually explicit conduct do not preponderate through the books, the overall theme of the books is that of a sly, ongoing joke of a sexual nature.  The books "feature" pornography under the <u>King</u> policy in that they promote themselves based on the sexual themes of the books.  While the <u>King</u> policy did not ban sexually explicit writing alone, the <u>Pretty Face</u> books contain both sexually explicit writing along with sexually explicit images.  Accordingly, the court recommends granting defendants' summary judgment motion as to the as-applied challenge to the <u>Pretty Face</u> books and denying Mr. Sisney's motion for summary judgment on this claim.

### b.  <u>Thrones of Desire</u>

This is a book of fourteen short stories by different authors.  The "forward" to the collection explains that the stories have plots and sex, but that the sex in the stories moves the plot along, it is not just a side attraction:  "Sex is integral and vital to the story."  Parts of all of the short stories clearly fit the current DOC policy definition of "sexually explicit" writing.  Therefore, the as-applied challenge succeeds only if the facial challenge succeeds—i.e. if defendants' banning of sexually explicit writing does not violate the First Amendment.

76

The <u>Turner</u> analysis is similar to the above-discussed facial challenge. Defendants have not addressed their penological goals and the reasonable relation of those goals to the expansion of the DOC pornography policy post-<u>King</u>.  There are no alternative methods for Mr. Sisney to exercise his right to receive sexually explicit communications.  Defendants do not address the ripple effects inherent in going back to the old <u>King</u> policy.  For example, for written pornography, defendants do not even address how many inmates at the SDSP are illiterate and, therefore, unable to partake, barter, or fight over written pornography.  Because of the absence of any rationale in the record concerning the expansion of the DOC pornography policy post-<u>King</u>, it is difficult to determine if defendants' response is an exaggerated response to a perceived problem.

The court has already held the current DOC policy is invalid facially, but that the policy may be enforced as far as the <u>King</u> policy would have allowed. Because the <u>King</u> policy did not ban sexually explicit writing, <u>Thrones of Desire</u> would not have been banned under that policy.  There is a single image on the cover of the <u>Thrones</u> book—a photograph of a scantily-clad woman.  Her genitals, buttocks, and nipples are fully covered.  Under the <u>King</u> policy, such depictions were allowed (as under the current policy as well).  The court recommends that Mr. Sisney's motion for summary judgment on his as-applied challenge be granted and that defendants' motion as to this claim be denied.

### c.  **Pride and Prejudice:  The Wild & Wanton Edition**

This book combines the complete original Pride and Prejudice novel

authored by Jane Austen with sexually explicit additions by Annabella Bloom.

Bloom's additions to the original text are printed in bold, helpfully to the reader

who wants to just skip ahead to the next sexually explicit insertion.  All of the

additions by Bloom clearly fit the current DOC policy definition of "sexually

explicit" writing.  Therefore, the as-applied challenge succeeds only if the facial

challenge succeeds—i.e. if defendants' banning of sexually explicit writing

violates the First Amendment, then applying the ban to this book is also

unconstitutional.

The Turner analysis is similar to the above-discussed facial challenge.

Defendants have not addressed their penological goals and the reasonable

relation of those goals to the expansion of the pornography policy post-King.

There are no alternative methods for Mr. Sisney to exercise his right to receive

sexually explicit communications.  Defendants do not address the ripple effects

inherent in going back to the old King policy.  Because defendants do not

acknowledge the expansion of the DOC pornography policy post-King, they do

not discuss the reasons for that expansion.  The court has no record from

which to conclude that defendants' response is not an exaggerated response to

a perceived problem.

The court has already held the current DOC policy is invalid facially, but

that the policy may be enforced as far as the King policy would have allowed.

Because the King policy did not ban sexually explicit writing, Pride and

78

Prejudice:  The Wild and Wanton Edition would not have been banned under that policy.  Also, the only pictorial image is on the cover of the book.  It is a photograph of an old-fashioned lace hand-held fan.  There is no nudity.  The court recommends that Mr. Sisney's motion for summary judgment on his as-applied challenge be granted and that defendants' motion as to this claim be denied.

### d.   **Matisse, Picasso, and Modern Art in Paris**

There is nothing tricky or subversive about this book.  It is a straight-up art book.  The book is designed as a companion to the T. Catesby Jones Collections of art which are held at the Virginia Museum of Fine Arts and the University of Virginia Art Museum.  The book contains pages and pages of text, explaining the art and the artists in the collection.  The text is interspersed with generous depictions of the various artworks contained in the Jones Collections.  Of these artworks, a very tiny handful have the odd bare breast or exposed buttock.

In the entire universe of art, some is controversial and provocative.  The photographs of Robert Mapplethorpe come to mind.  Many Mapplethorpe photos contain full frontal nudity including fully erect male penises and often feature S & M themes.  They touched off such a controversy in 1989 that it has taken nearly 30 years for a museum to feature a Mapplethorpe retrospective.[20] See http://www.npr.org/2016/03/17/470791941/robert-mapplethorpes-provocative-art-finds-a-new-home-in-la.  Last checked May 4, 2016.

---

[20] Mapplethorpe died at the height of the culture wars he helped ignite on March 9, 1989.

Mapplethorpe could not be further from the tenor or type of art contained in the <u>Matisse</u> book.  The nudes, few in number, are like still life paintings.  They are restful and peaceful and none contain any sexually explicit component.  No subject of any painting is depicted lewdly or is engaged in any actual or simulated sex act.  They are simply nudes, usually depicted in highly stylized or abstract form.  <u>See</u> Exhibit 88, <u>Matisse, Picasso and Modern Art in Paris</u>, pages 43, 69, 86-87, 91, 94, 101, and 107.

The description on the rejection form is a one-size-fits-all generic description, not individualized to any particular item.  <u>See</u> Docket No. 69-13.  The first sentence of the form description states:

> The item depicts pornographic materials or encourages sexual behavior, pornography, nudity or sexually explicit conduct which is criminal in nature and/or may be detrimental to your rehabilitation.

<u>Id.</u>  Nothing in the nudes in this book encourages criminal sexual behavior, criminal pornography, criminal nudity, or criminal sexually explicit conduct.  If this sentence applies, then, it must be only because the nudes are considered "pornographic."

When defendants initially responded to Mr. Sisney's grievance of the rejection of the <u>Matisse</u> book, they stated only that the book violated policy and was not allowed.  <u>See</u> Docket No. 69-15.  Defendant Young, on appeal, rejected the grievance with the following statement:  "All three (3) books you ordered were rejected for sexually explicit content.  Two (2) of the books also have nudity in them."  <u>See</u> Docket No. 69-17.

Contrary to what defendant Young wrote, there simply is no sexually explicit content in the <u>Matisse</u> book.  Sexually explicit is defined under the DOC policy as "depiction of actual or simulated sexual acts, including but not limited to sexual intercourse, oral sex or masturbation."  <u>See</u> Appendix 2.  None of the nudes are depicted engaging in actual or simulated sexual acts.  <u>See</u> Exhibit 88, <u>Matisse, Picasso and Modern Art in Paris</u>, pages 43, 69, 86-87, 91, 94, 101, and 107.  They are, however, "nude" as "nudity" is defined in the DOC policy.  This book, along with the Michelangelo pictures, convinces the court that defendants' response to the problem of pornography in prisons is an "exaggerated response."

This book clearly fits the current DOC policy definition of "nudity."  Therefore, the as-applied challenge succeeds only if the facial challenge succeeds—i.e. if defendants' banning of all nudity does not violate the First Amendment.

The <u>Turner</u> analysis is similar to the above-discussed facial challenge.  Defendants have not addressed their penological goals and the reasonable relation of those goals to the expansion of the pornography policy post-<u>King</u>.  There are no alternative methods for Mr. Sisney to exercise his right to receive sexually explicit communications.  Defendants do not address the ripple effects inherent in going back to the old <u>King</u> policy.  Critically, defendants do not address why they found it necessary to change the <u>King</u> policy banning publications that routinely featured pornography or promoted themselves based on pornographic content to the current policy in which a single, nude

image can and does result in censorship.  Just as critically, defendants
stonewall any inquiry into the real-world application of their policy exception
for educational, medical and anthropological purposes.  As to the Matisse book,
defendants' response clearly appears—on this record—to be an exaggerated
response to a perceived problem.

The court has already held the current DOC policy is invalid facially, but
that the policy may be enforced as far as the King policy would have allowed.
Because the King policy banned only those publications that regularly and
routinely featured pornography or that promoted themselves based on
pornographic content, this art book would not have been banned under that
policy.  The nude images in this book do not preponderate, composing a
distinct minority of the art pictured within.  And the conservators of the Jones
Collection did not promote the book based on its nude content.  The court
recommends that Mr. Sisney's motion for summary judgment on his as-applied
challenge be granted and that defendants' motion as to this claim be denied.

### e.    Michaelangelo Pictures and Sculptures

The printed photos of works by Michaelangelo are found in the court's
docket at Docket No. 40-2 through 40-9.  They all depict portions of various
scenes painted by Michaelangelo in the Sistine Chapel, drawings for later
paintings, or sculptures.  Id.  One such photo is of the sculpture of David from
the Old Testament of the Bible.  A reproduction of this same sculpture graces
Fawick Park here in Sioux Falls, South Dakota.  The statue of David may very
well be visible from afar by Mr. Sisney from his perch on top the hill at the

SDSP, though he would only be able to see David's (bare) buttocks from that vantage point. Many of these Michaelangelo works, including the statue of David, feature full frontal (unerect) male nudity. These works clearly fit the current DOC policy definition of "nudity." Bare buttocks and bare genitalia are visible. Therefore, the as-applied challenge succeeds only if the facial challenge succeeds—i.e. if defendants' banning of all nudity does not violate the First Amendment.

The <u>Turner</u> analysis is similar to the above-discussed facial challenge. Defendants have not addressed their penological goals and the reasonable relation of those goals to the expansion of the pornography policy post-<u>King</u>. There are no alternative methods for Mr. Sisney to exercise his right to receive sexually explicit communications. Defendants do not address the ripple effects inherent in going back to the old <u>King</u> policy. Critically, defendants do not address why they found it necessary to change the <u>King</u> policy banning publications that routinely featured pornography or promoted themselves based on pornographic content to the current policy in which a single, nude image can and does result in censorship. Just as critically, defendants stonewall any inquiry into the real-world application of their policy exception for educational, medical and anthropological purposes. As to the Michelangelo pictures, defendants' response clearly appears—on this record—to be an exaggerated response to a perceived problem.

The court has already held the current DOC policy is invalid facially, but that the policy may be enforced as far as the <u>King</u> policy would have allowed.

83

Because the <u>King</u> policy banned only those publications that regularly and routinely featured pornography or that promoted themselves based on pornographic content, these pictures would not have been banned under that policy. The nude images do not preponderate and the conservators of this art, mostly the Vatican, do not promote the art works based on their nude content. The court recommends that Mr. Sisney's motion for summary judgment on his as-applied challenge be granted and that defendants' motion as to this claim be denied.

### f.   Coppertone® Advertisement

The final exhibit is found at Docket No. 40-10. It is a Coppertone® advertisement that will be familiar to anyone over the age of 45 or 50. It features a little girl in pigtails, perhaps between the ages of three and six. She is deeply tanned and wears a bikini bottom, but no top of any kind (her chest faces away from the viewer and is not visible). <u>Id.</u> A little black dog has her bikini bottom between his teeth and is pulling on it, revealing the upper globes of her pale buttocks. <u>Id.</u> Two ad slogans are visible, one stating "Tan . . . Don't Burn . . . Use Coppertone." The other slogan says "Don't be a Paleface." <u>Id.</u> Coppertone introduced the ad in 1959. <u>See</u> http://www.tvacres.com/admascots_coppertone.htm. Last checked May 4, 2016. Coopertone changed its ad to be more modest at the turn of the 21st century. <u>Id.</u>

This ad clearly fits the current DOC policy definition of "nudity." The little girls' buttocks in the ad are mostly visible. Therefore, the as-applied

84

challenge succeeds only if the facial challenge succeeds—i.e. if defendants' banning of all nudity does not violate the First Amendment.

The Turner analysis is similar to the above-discussed facial challenge. Defendants have not addressed their penological goals and the reasonable relation of those goals to the expansion of the pornography policy post-King. There are no alternative methods for Mr. Sisney to exercise his right to receive sexually explicit communications. Defendants do not address the ripple effects inherent in going back to the old King policy.

The court has already held the current DOC policy is invalid facially, but that the policy may be enforced as far as the King policy would have allowed. It is a close question whether this ad would have been banned under King. Clearly, the big attraction of the ad was the exposure of a little girl's buttocks. Thus, one could conclude that Coppertone® promoted itself based on the nude content of the ad. This is precisely the type of image one would hope to keep out of the hands of a child sexual offender, though the image is innocuous to those of us not afflicted with those criminal desires. The court concludes this image would have been banned even under the King policy. For that reason, the court recommends granting defendants' motion for summary judgment on this as-applied claim and denying Mr. Sisney's motion on the claim.

### g.      The Exception in the Current DOC Policy

There is an exception to the ban on publications containing nudity in the current DOC policy for nude material that is "illustrative of medical, educational or anthropological content." See Appendix 2. The exception is

85

permissive, not mandatory, because it uses the word "may." Therefore, application of the exception can be denied by prison authorities in specific instances if, in their discretion, a nude that fits within the exception should nevertheless be kept out of the prison—the Mapplethorpe photographs come to mind. Merely because material has some artistic merit does not mean inmates automatically are entitled to possess it. Ashker v. Schwarzenegger, 2009 WL 801557 *11 (N.D. Ca. 2009).

Defendants have taken the position in their summary judgment motion that the exception cannot apply to nudes that constitute "art" unless the inmate requesting the nudes is a "serious student of the arts." They urge the court to hold the exception to be inapplicable to Mr. Sisney because he is not enrolled in any art classes at SDSP.

Under the defendants' interpretation of the exception to nudity for educational, medical or anthropological purposes, in order for the exception to be anything but illusory, there would, as a matter of common sense, have to be "educational," "medical" and "anthropological" classes available for SDSP inmates to enroll in. Without such classes, inmates cannot qualify for the exception—according to defendants' interpretation of the DOC policy.

But defendants have steadfastly refused Mr. Sisney's attempts to pin them down as to what rehabilitation resources are available to SDSP inmates in general, and to him in particular. Defendants have labeled all such attempts or requests by Mr. Sisney as "irrelevant." The court does not share defendants' view. Whether educational, medical or anthropological classes are

86

available to Mr. Sisney is crucial to evaluating whether the "exception" to the DOC policy is illusory or real.  Similarly, whether defendants have *ever* granted an exception for nude material pursuant to the policy is relevant as it would tend to show whether the exception is ever applied.  Defendants have stone-walled Mr. Sisney's attempts to obtain such information and, so, have stone-walled the court too.

In an as-applied challenge to prison officials' censorship of a particular magazine, the prison officials stated the particular issue of the magazine was "so racially inflammatory as to be reasonably likely to cause violence." Murphy, 372 F.3d at 986.  The court reviewed the issue of the magazine in question and found that "it does not appear to counsel violence." Id.  Holding that defendants' rationale for withholding the magazine was "too conclusory to support a judgment in its favor" on the as-applied challenge, the court reversed the district court's grant of summary judgment. Id.  The court recognized that the expertise of prison officials required deference on the court's part, but required that those officials present specific evidence as to why the particular magazine issue in question implicated prison security. Id.

In Amatel, the BOP admittedly allowed *Victoria's Secret* catalogs and the *Sports Illustrated Swimsuit Edition* to reach inmates. Amatel, 156 F.3d at 202. The court noted it found "it all but impossible to believe that the Swimsuit Edition and Victoria's Secret pass muster [under the policy] while Michelangelo's David or concentration camp pictures fail; nor has there been any suggestion that any prison official has attempted to implement such a

bizarre interpretation." Id.  Defendants herein implemented such a bizarre interpretation.

Mr. Sisney argues the materials defendants banned in his as-applied challenge are no more obscene or detrimental to prison security or rehabilitation than the popular television shows Family Guy and American Dad.  That may be true, but it begs the question.

In Murchison v. Rogers, 779 F.3d 882, 889 (8th Cir. 2015), prison officials produced affidavits and testimony specifically linking the exact material that was censored in that case with the prison censorship policy and their penological goals.  The censored material was an article in Newsweek regarding Mexican drug cartels that included photographs of corpses hanging from a bridge and the body of a murdered journalist lying in a pool of blood. Id. at 888.  The prison officials produced sworn testimony that photos of death and murder promote prison violence, disorder, or violations of law.  Id. at 889. Further sworn testimony explained that prolonged exposure to violent acts through print media reinforces socially irresponsible prison behavior.  Id. Finally, testimony from defendants established that print materials depicting violent acts circulate in the prison and are used to threaten other inmates, as prison currency, and as gang affiliation identification.  Id.  In approving the prison officials' censorship of the specific Newsweek article at issue, the court reiterated that there was no suggestion the prison used a blanket ban on Newsweek itself, or on all material containing any type of violent content.  Id. at 889, 891 (noting inmate could read about drug cartels and free press issues

in Mexico from other sources and that other materials depicting violent subject matter was available in the prison).

Here, the current DOC policy, unlike the policy in <u>Murchison</u>, allows no other access to sexually explicit pictures or writing.  The defendants have refused to address the real differences between the <u>King</u> policy and the current DOC pornography policy.  The court has concluded that, because of defendants' refusal, the current policy must be declared facially invalid pursuant to Mr. Sisney's summary judgment motion.  Critical to the court's analysis is the lack of any alternative avenue to exercise the right to receive sexually explicit material, the fact that many (not a single) decision-maker carries out the censorship, and the absence of the requirement that a publication routinely contain pornographic content or promote itself based on that content.

The mere fact that defendants have censored such magazines of general circulation such as *Glamour, U.S. Weekly,* and *Men's Fitness* is beside the point.  As <u>Murchison</u> shows, even a news magazine like *Newsweek* can permissibly be censored by prison officials, so long as the censorship is not a complete ban on all issues of *Newsweek* and so long as the prison does not categorically ban all publications touching on a certain topic—in <u>Murchison</u>, that topic was violence.  Here, the topic is sexually explicit materials.

There is no suggestion in the record before the court that defendants ban all issues of *Glamour, U.S. Weekly,* or *Men's Fitness,* but there is concrete proof that they *do* ban all publications with any pornographic content, no matter

89

how sporadic or isolated.  That, even for inmates, runs afoul of the First Amendment without specific evidence in the record from defendants in support of their position.

**C.    Due Process**

Mr. Sisney argues the DOC policy deprives him of due process.  It seems Mr. Sisney is raising both a procedural due process argument and a void-for-vagueness argument.

**1.    Procedural Due Process**

When prison officials confiscate an inmate's mail, certain minimal procedural safeguards are required by the Due Process clause.  <u>Martinez</u>, 416 U.S. at 417-19.  Those safeguards are (1) notice to the inmate of the confiscation, (2) an opportunity for the inmate to be heard, and (3) an opportunity for the inmate to appeal to a prison official not involved in the original censorship.  <u>Id.</u> at 418-19.  Here, the DOC policy meets those requirements.  <u>See</u> Appendix 2; Docket No. 69-2 at pp. 7-9.  The policy requires DOC staff to notify inmates if correspondence is confiscated.  <u>Id.</u>  The inmate may then file a request for administrative remedy to protest the confiscation. <u>Id.</u>  The administrative process is evaluated by someone other than the DOC staff person who made the decision to confiscate the correspondence.  <u>See</u> Docket No. 69-2 at pp. 7-9.  The DOC policy accords appropriate procedural due process protections.  <u>Martinez</u>, 416 U.S. at 418-19.  The Due Process clause does not require that prison officials let inmates see the material they are withholding in order to challenge the censorship.

90

## 2.    Vagueness

"A statute is unconstitutionally vague if persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.' " <u>United States v. Posters N Things Ltd.</u>, 969 F.2d 652, 659 (8th Cir. 1992) (quoting <u>Connally v. General Constr. Co.</u>, 269 U.S. 385, 391 (1926)).  The burden is on Mr. Sisney to demonstrate that the DOC pornography policy is unconstitutionally vague.  <u>Id.</u>

The gist of Mr. Sisney's argument centers around the term "feature" in the current DOC policy.  As discussed above, in the policy at issue in <u>King</u>, the word "feature" was defined to mean a publication which routinely and regularly featured pornography or, in the case of one-time issues, promoted itself based on pornographic content.  <u>See</u> Appendix 1.  That definition has now been removed from the DOC policy (as of June, 2009), but the word "feature" remains part of the policy.  Defendants have steadfastly refused to provide a definition of "feature" in the current DOC policy in this litigation.  Their application of the policy in practice convinces the court that defendants now define "feature" to mean a one-time appearance of a single nude picture in an issue of a magazine even if that magazine usually does not contain nudity and does not promote itself based on nude content.

This is certainly different from how the <u>King</u> policy defined "feature."  <u>See</u> Appendix 1.  It is also different from how other prison officials have defined the term in their policies.  For example, defendants in <u>Smith v. Roy</u>, 2012 WL 1004985 at *10 (D. Minn. Jan. 25, 2012), defined "feature" based on the ratio

91

of nude images to the total number of pages in the publication, the manner in which the nude images are displayed (including size); and whether the publication advertised nude images on the front page.  The dictionary defines "feature" as "to be a feature or distinctive mark of; to make a feature of; give prominence to; to delineate the main characteristics of."  See http://www.dictionary.com/browse/feature?s=t last checked May 17, 2016. Defendants clearly do not define "feature" as the dictionary does.

Although defendants' definition of "feature" as apparent from their interpretation and application of the policy does not coincide with the definition of "feature" found elsewhere, defendants are of course free to interpret and apply their policy as they see fit.  The court adopts the apparent definition of "feature" used by defendants in their application of the current DOC pornography policy.

Mr. Sisney meets himself "coming and going" a bit in his arguments in his brief.  In arguing the facial invalidity of the policy, he explains the exact meaning of the policy and to what extreme lengths the policy applies.  Then, he argues in support of his due process claim that he cannot decipher what the policy means or what "feature" means.

The court agrees with Mr. Sisney's former argument:  through its various revisions until it has reached its current form, the DOC pornography policy has gotten more and more detailed and specific.  The court agrees with Mr. Sisney's reading of the policy as to his facial challenge based on the First Amendment: the policy is quite clear and quite specific.  Every document containing any

bare genitalia, buttock or female breast is "nudity" and is absolutely banned, even if the document is 200 pages long and has one offending page within it. Also, every document describing any sexually explicit conduct or picturing oral sex, anal sex, intercourse, or masturbation is absolutely banned, again, even if the offending part is but a small portion of the overall document. Finally, the court agrees with Mr. Sisney that the policy through its ban on "manufacturing" bans pornography both as to outgoing correspondence and documents created within the prison walls that are never destined for the outside. Because the court is not required to "guess" at the meaning of the DOC pornography policy, the court rejects Mr. Sisney's argument that the policy is unconstitutionally vague.

**D.    Official Capacity**[21]

Official-capacity claims against state officials are treated as suits against the State itself. Kentucky v. Graham, 473 U.S. 159, 165 (1985). The Supreme Court has held that money damages are not available for § 1983 claims against state officials who are sued in their official capacities. Will v. Michigan Dept. of State Police, 491 U.S. 58, 64, 71 (1989). However, prospective injunctive relief *is* available against state *officials* (though not against the state itself), when sued in their official capacities. Will, 491 U.S. at 71 at n.10. This is because

---

[21] Defendants devote an entire section of their brief arguing why Mr. Sisney's "individual capacity" claims must fail. See Docket No. 68 at pp. 12-15. However, Mr. Sisney clearly states in his complaint and supplemental complaint that he sues the four named defendants in their official capacities only. See Docket No. 1 at pp. 1-3, ¶¶ 4-7; Docket No. 8-1 at pp. 1-3, ¶¶ 4-7. The court does not, therefore, address defendants' individual capacity arguments.

"official-capacity actions for prospective relief are not treated as actions against the State." Id. (quoting Graham, 473 U.S. at 167 n.14 (citing Ex Parte Young, 209 U.S. 123, 159-60 (1908))).  Therefore, an official-capacity claim for prospective injunctive relief might be asserted, for example, against an *officer* of a state university, but could not be asserted against the university itself, which is the state itself (agencies of the state are also the state for purposes of the Eleventh Amendment).  Monroe v. Arkansas State Univ., 495 F.3d 591, 594 (8th Cir. 2007).  Eleventh Amendment immunity protects the state itself from being sued.  Id.  When an official capacity claim is asserted for injunctive relief against a state officer, the defense of qualified immunity does not apply.  Pearson v. Callahan, 555 U.S. 223, 242-43 (2009); Grantham v. Trickey, 21 F.3d 289, 295 (8th Cir. 1994).

"Because the real party in interest in an official capacity suit is the governmental entity and not the named official, 'the entity's "policy or custom" must have played a part in the violation of federal law.' " Hafer v. Melo, 502 U.S. 21, 25 (1991).  This is because local governmental entities can only be held liable under § 1983 to the extent the constitutional deprivation was made pursuant to official policy or custom of the city, county or other local governmental unit.  See Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 689-90 (1978).  In official capacity suits, the only immunities available to an individually-named defendant are the immunities that the governmental entity possesses—i.e. usually Eleventh Amendment immunity.  Hafer, 502 U.S. at 25.  "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a

constitutional injury is caused by 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" Gladden v. Richbourg, 759 F.3d 960, 968 (8th Cir. 2014) (quoting Grayson v. Ross, 454 F.3d 802, 810 (8th Cir. 2006)). An official policy or custom will not be inferred from the occurrence of a single incident. Remington v. Hoopes, 611 Fed.Appx. 883 at *3 (8th Cir. 2015) (citing Wedemeier v. City of Ballwin, 931 F.2d 24, 26 (8th Cir. 1991)).

Defendants concede that defendant Young, the warden at SDSP, was the final decision maker as to the interpretation and application of the DOC policy at the SDSP. They concede as well that defendant Young was involved in the appeals process of the rejection of the various items involved in Mr. Sisney's as-applied challenge. This makes defendant Young the appropriate defendant on Mr. Sisney's as-applied challenge.

Defendants also concede that defendant Kaemingk, the Secretary of the DOC, is the final decision maker as to the DOC pornography policy itself. Therefore, Kaemingk is the appropriate defendant on Mr. Sisney's facial challenge to the DOC pornography policy.

That leaves defendants Reimann and Mousel. Defendants argue Mr. Sisney must sue only the defendant who possessed final decision making authority over the subject matter, citing Nix v. Norman, 879 F.2d 429, 433 (8th Cir. 1989). See Docket No. 68 at pp. 10-11. However, defendants omit half of the holding stated in Nix. What the Nix court actually stated was, "[t]o establish liability in an official-capacity suit under section 1983, a plaintiff

95

must show *either* that the official named in the suit took an action pursuant to an unconstitutional governmental policy or custom, *or* that he or she possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner." Nix, 879 F.2d at 433 (citing Monell v. New York City Dept. of Social Servs., 436 U.S. 658 (1978); and Pembaur v. City of Cincinnati, 475 U.S. 469 (1986)) (emphasis added).  Thus, defendants Young and Kaemingk are appropriately sued under the second alternative set forth in Nix. Mr. Sisney can sue defendants Mousel and Reimann under the first alternative set forth in Nix if he can show that they took action pursuant to an unconstitutional governmental policy or custom.  Id.

Here, Mr. Sisney has shown evidence that both Mousel and Reimann were involved in rejection of the materials he attempted to receive.  Mousel was the rejecting officer on the Thrones of Desire, Pride and Prejudice:  the Wanton Edition, and Matisse, Picasso and Modern Art in Paris books.  See Docket No. 69-13.  Reimann was the rejecting officer on the November, 2015, attempted delivery of the Michelangelo pictures.  See Docket No. 91-3.  In addition, Reimann was the rejecting officer on the various attempted deliveries of *Glamour* magazine which the court considered as evidence of how the defendants interpret the DOC policy facially.  See Docket Nos. 1-4 at pp. 5-7 and 95-14.  Thus, both Reimann and Mousel are appropriate defendants in their official capacities if they acted pursuant to an unconstitutional governmental policy.  Nix, 879 F.2d at 433.  They did.  They are, therefore, appropriately sued herein.

96

Defendants argue that defendant Reimann should be dismissed altogether as she had absolutely "no involvement whatsoever in the rejection of" the materials in this case.  <u>See</u> Docket 71 at p. 2, ¶ 4.  Of course, Mr. Sisney has produced competent evidence to the contrary, discussed above.  <u>See</u> Docket No. 91-3.  Accordingly, the court rejects defendants' argument that any of the four named defendants should be dismissed because they are improper parties for official capacity suits.

## CONCLUSION

Based upon the foregoing law, facts, and analysis, this magistrate judge respectfully makes the following recommendations:

1.    Defendants' motion for summary judgment [Docket No. 67] be granted in part and denied in part as follows:

     a.    defendants' motion for summary judgment on Mr. Sisney's facial challenge be denied;

     b.    defendants' motion for summary judgment on Mr. Sisney's as-applied challenge be granted as to the <u>Pretty Face</u> books and the Coppertone® advertisement;

     c.    defendants' motion for summary judgment on Mr. Sisney's as-applied challenge be denied as to the <u>Thrones of Desire</u> book, the <u>Pride and Prejudice:  The Wild and Wanton Edition</u> book, the Michelangelo pictures, and <u>Matisse, Picasso and Modern Art in Paris</u>; and

     d.    defendants' motion for summary judgment on Mr. Sisney's due process claims be granted.

2.    Plaintiff Charles Sisney's motion for summary judgment [Docket No. 92] be granted in part and denied in part as follows:

     a.    Mr. Sisney's motion for summary judgment on his facial challenge be granted;

97

b.     Mr. Sisney's motion for summary judgment on his as-applied challenge be denied as to the <u>Pretty Face</u> books and the Coppertone® advertisement;

c.     Mr. Sisney's motion for summary judgment on his as-applied challenge be granted as to the <u>Thrones of Desire</u> book, the <u>Pride and Prejudice:  The Wild and Wanton Edition</u> book; the Michelangelo pictures, and <u>Matisse, Picasso and Modern Art in Paris</u> book; and

d.     Mr. Sisney's motion for summary judgment on his due process claims be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED May 25, 2016.

BY THE COURT:

*Veronica L. Duffy*

VERONICA L. DUFFY
United States Magistrate Judge