UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

*******************************************************************************

| | | |
|---|---|---|
| | * | |
| CHARLES E. SISNEY, | * | CIV 15-4069 |
| | * | |
| Plaintiff, | * | |
| | * | |
| | * | AMENDED |
| vs. | * | MEMORANDUM OPINION |
| | * | AND ORDER |
| DENNY KAEMINGK, in his official | * | |
| capacity as the South Dakota | * | |
| Secretary of Corrections; | * | |
| DARIN YOUNG, in his official | * | |
| capacity as the Warden of the | * | |
| South Dakota State Penitentiary; | * | |
| SHARON REIMANN, in her official | * | |
| capacity as an SDSP designated | * | |
| Mailroom Officer; and | * | |
| CRAIG MOUSEL, in his official | * | |
| capacity as an SDSP designated | * | |
| Property Officer, | * | |
| | * | |
| Defendants. | * | |
| | * | |

*******************************************************************************

This case is upon remand from *Sisney v. Kaemingk*, 886 F.3d 692 (2018). Subsequently the case has been briefed and argued to the Court. Sisney makes both as applied and facial challenges to the current South Dakota Department of Corrections (DOC) pornography policy. Count V deals with Defendants' rejection of seven specific publications which were to be delivered to Mr. Sisney, those being: Pretty Face Manga Comics, Volumes 3, 4, 5, 6, a book entitled Thrones of Desire, and another book, Pride and Prejudice: The Wild and Wanton Edition, and an art book entitled Matisse, Picasso and Modern Art in Paris. Count VI deals with Defendants' rejection of nine pictures:

- Paradise by Michelangelo

- The Expulsion from the Garden by Michelangelo (Sistine Chapel ceiling painting, bay 4)

- Statute of David by Michelangelo

- Bronze The Creation of Adam and Eve by Lorenzo Ghiberti

- The Fall and Expulsion from the Garden of Eden by Michelangelo (Sistine Chapel ceiling painting)

- Study of the Resurrection of the Dead by Michelangelo

- Paradise Bronze by Michelangelo

The Report and Recommendation details the factual history of the case and those factual findings are adopted unless stated otherwise.

The 2014 DOC "Pornography" policy in question "prohibits the purchase, possession and attempted possession and manufacturing of pornographic material by offenders in its institutions."

The definitions are:

**Pornographic Material:**
Includes books, articles, pamphlets, magazines, periodicals, or any other publications or materials that feature nudity or "sexually explicit" conduct.  Pornographic material may also include books, pamphlets, magazines, periodicals or other publications or material that features, or includes photographs, drawings, etchings, paintings, or other graphic depictions of nudity or sexually explicit material.

**Nudity:**
"Nudity" means a pictorial or other graphic depiction where male or female genitalia, pubic area, buttocks or female breasts are exposed.  Published material containing nudity illustrative of medical, educational or anthropological content may be excluded from this definition.

**Sexually Explicit:**
"Sexually Explicit" includes written and/or pictorial, graphic depiction of actual or simulated sexual acts, including but not limited to sexual intercourse, oral sex or masturbation.  Sexually explicit material also includes individual pictures, photographs, drawings, etchings, writings or paintings of nudity or sexually explicit conduct that are not part of a book, pamphlet, magazine, periodical or other publication.

2

## DISCUSSION

In reviewing the 2014 DOC Policy, the policy as applied is what must be considered.  Even though the current policy does still contain the word "feature," the policy as applied is that one word or one image is enough to get a book or other publication banned even though nudity or pornography is not "featured" in the publication or the image.

This Court previously approved another prison publication review policy in 2003.  *King v. Dooley*, 4:00-cv-04052-LLP, Docket No. 34 (D.S.D. June 16, 2003).  How the *King* policy would apply to the publications in question is dicta.  The only consideration of the *King* policy is to dismiss the Defendants' claim that the *King* policy is essentially the same as the 2014 policy now under consideration and as an alternative policy.  See Report and Recommendation detailing the differences, pp 36-41 (Doc. 105).  In brief, the *King* policy did not apply to written materials nor to the manufacturing of images or objects.  The *King* policy under its definition of "features" looked at the item in question in its entirety rather than, for example, censoring an entire book because of one page in the book even if that page was present not for its prurient interest but instead was a part of the narrative in the theme of the book.  An example is the book <u>Some Luck</u> by Pulitzer prize winning author Jane Smiley.  The book is a 395 page novel published in 2014 as the first of a trilogy dealing with the life of an Iowa farm family starting in 1920.  The book was selected by the South Dakota Humanities Council for the One Book South Dakota program and thus read by a variety of reading groups.  A couple of short scenes in the narrative theme of the maturation of Frank, one of the principal characters.  The scenes would get the book banned under the current policy as it is applied.  Those scenes are an integral, albeit brief part of the book and a part of Frank's early experiences and not presented for any prurient interest.

An as applied as well as a facial challenge is being analyzed where there has been no separate justification for the 2014 policy put forth by the Defendants other than broad general arguments.  Court approval of the *King* policy is no basis for the approval of the present policy as they differ significantly.  In addition, Defendants have not shown another approved policy in another jurisdiction that is as restrictive as this policy as it is applied.   *Turner* analysis is applicable to both as applied and facial challenges. *Thornburgh v. Abbott*, 490 U.S. 401, 403, 109 S.Ct. 1874 (1989)

(considering both a facial and as applied challenge); *Bahrampour v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004).  The ultimate *Turner* reasonable relation to legitimate penological interests test will be applied to each item.  *Turner* provides four factors for the reasonable relations test.  The factors have the same analysis for each of the items except as otherwise noted.  The four factors need not be each given the same weight in each analysis.

Under the first *Turner* factor, the governmental objective underlying the regulations is legitimate and neutral.  The pornography policy is related to a governmental objective, but not reasonably so except in the instances of Manga Comics and Coppertone®.

As for the second factor, there is no alternate means by which prisoners can exercise their First Amendment rights unless prisoners were evaluated individually and provided access according to their profile.  For example, prisoners inclined to violence would get no violence related materials.  See *Murchison v. Rogers*, 779 F.3d 682 (8th Cir. 2015) (single issue of <u>Newsweek</u> magazine banned to all the prison population for its strong depiction of gang violence).  Child sex offenders would not get Coppertone® type ads or other similar materials.  Although such specific limitations are possible, it is not reasonable for the courts to require that level of specificity from prison administrators.  As a result, there are no reasonable alternate means by which prisoners could exercise their First Amendment rights.

Third, what impact would the accommodation of Mr. Sisney's asserted constitutional right have on others (guards and inmates) inside the prison.  Given the dearth of evidence in the record, it is difficult to envision any impact upon others except for the Manga Comics and the Coppertone® ad.  Each could be trading stock to some.  The Manga Comics could be bartered for their sexual themes and could give rise to new ideas with which to taunt female employees.

Fourth, whether there are obvious, easy alternatives whose existence show that the regulation in question is not reasonable, but is an "exaggerated response" to prison concerns.  An easy alternative, by no means the only one, is the *King* policy that this Court approved of in 2003.  No reasons have been shown for this strict departure from that policy.  No showing has been made that

the *King* policy caused problems in the penitentiaries.  The banning, for example, of the <u>Matisse Picasso and Modern Art in Paris</u> book is a clear example of an exaggerated response as is the banning of the paintings and sculpture of Michelangelo.  By contrast, the banning of Manga Comics and the Coppertone® ad are not exaggerated responses.

## MANGA COMICS

The comic books are not good literature or even close to it, but that is not the question.  The comic books have sophomoric situations which do have a sexual tone.  The third comic book is mainly about a teenage boy who gets a female face transplant after a motor vehicle accident and is living life as a teenage girl at a girl's high school.  Book 3 contains approximately 200 pages, dealing mostly with situations where the boy is nearly found out to be a boy or gets to hug girls.  On page 142 a man tries to sell the boy a pair of fake silicone breasts he can affix to his person.  The fake breasts are depicted bare with exposed nipples, but they are torso only.  On page 155, the boy is trying out an all body female suit covered with a skimpy one-piece bathing suit when a snake attacks him, crawling between the covered breasts of the suit.  The snake is drawn to look like a penis.  The female body suit is subsequently pictured holding a limp snake dripping some liquid.  Books 4, 5 and 6 are similar to Book 3.  Pornographic images do not preponderate in the books but the ongoing sexual tone does preponderate.  The voyeurism, other sexual content, and the continued sexual tone which are the feature of these juvenile books do warrant granting Defendants' Motion for Summary Judgment as to the *Pretty Face* manga comics.  Pursuant to *Turner* the Court is to conduct an "independent review of the evidence."  *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979-986 (8th Cir. 2004).  The evidence consists of the books themselves.  That review leads the Court to the conclusion that the banning of the Manga Books is not an exaggerated response by Defendants but instead is within their discretion in determining what is sexually explicit.  This banning does appear to be reasonably related to legitimate penological interests.  *Turner* at 89; *Murchison v. Rogers*, 779 F.3d 882, 885 (8th Cir. 2015).

## THE COPPERTONE® ADVERTISEMENT

The ad is at Docket No. 40-10.  It is a Coppertone® advertisement for suntan lotion.  It features a little girl in pigtails, probably between three to six years of age.  She is deeply tanned and

wears a brief bottom but no top (her chest faces away from the viewer and is not visible).  A little black dog has her briefs between his teeth and is pulling on them, revealing the upper globes of her pale buttocks.  Two ad slogans are visible, one stating "Tan . . . Don't Burn . . . Use Coppertone®."  The other slogan says "Don't be a Paleface." *Id.*  Coppertone® introduced the ad in 1959.  *See* http://www.tvacres.com/admascots.coppertone.htm. Coppertone® changed its ad to be more modest at the turn of the 21st Century. *Id.*

In this instance the Defendants did raise the specific concern of the attraction of this ad to child sexual offenders.  Even without a definition of "feature," this ad does not feature nudity.  Instead it features the "cuteness" of the scene of a little girl and her puppy as it would appeal to most people.  Despite that, the attraction of this ad to the prurient interests of some child sex offenders, be they hands-on or viewers, is obvious.  Even though child sexual offenders make up only a portion of the prison population, this is an instance where penological objectives concerning the minority, child sex offenders, must override the position of the majority of prisoners that not being child sex offenders they should be able to view this and other ads that would be neutral to other observers.  The current policy ban on this seemingly innocuous ad is, however, reasonably related to a legitimate penological objective.  Defendants' Motion for Summary Judgment as to the Coppertone® advertisement is granted.

## THRONES OF DESIRE

This book contains fourteen short stories by different authors.  The "forward" to the collection correctly explains that the stories have plot and sex, but that the sex in the stories moves the plot along, it is not just a side attraction.  Defendants have not addressed how the banning of this written material meets their penological goals.  There is only one image, that being a photograph of a scantily-clad woman on the cover of the book.  Her genitals, buttocks and nipples are fully covered.  If that is the reason for the banning, no rationale is given for how this meets any penological goals.  Defendants' Motion for Summary Judgment as to this publication is denied.

## PRIDE AND PREJUDICE: THE WILD & WANTON EDITION

This book combines the complete original Pride and Prejudice novel by Jane Austen with

6

titillating additions by Annabella Bloom.  The additions to the original text are printed in bold, helping the reader identify the next addition.  There are no visual images.  Even though titillating to some persons, Defendants have not shown how the banning of this book is reasonably related to a legitimate penological objective.  Defendants' Motion for Summary Judgment as to this book is denied.

## MATISSE, PICASSO AND MODERN ARTS IN PARIS

This is simply an art book.  There are not any sexual innuendos or sexual themes to it.  The book is a companion to the T. Catesby Jones Collections of Art at the Virginia Museum of Fine Arts and the University of Virginia Art Museum.  The book contains pages and pages of text, explaining the art and the artists in the collection.  The text is interspersed with numerous depictions of various artworks in the Jones Collections.  Of these depictions, a very tiny handful have the odd bare breast or exposed buttocks.  The nudes, few in number, are like still life paintings.  They do not contain any sexually explicit content.  None of the paintings depict their subject lewdly or as engaged in any actual or simulated sexual acts, nor is there any suggestion of S&M or other violent acts.

The first sentence of the rejection form states:

The item depicts pornographic materials or encourages sexual behavior, pornography, nudity or sexually explicit conduct which is criminal in nature and/or may be detrimental to your rehabilitation.

Docket No. 69-13.

Nothing in the book encourages sexual behavior, criminal pornography, criminal nudity or criminal sexually explicit conduct.  Thus the denial had to be on the basis that the nudes are considered pornographic.  On appeal, Defendant Warden Young rejected the grievance, stating: "All three (3) books you ordered were rejected for sexually explicit content.  Two (2) of the books also have nudity in them."  Docket 69-17.  There is no sexually explicit content in the Matisse book.  Sexually explicit is defined under the DOC Policy as "depiction of actual or simulated sexual acts, including but not limited to sexual intercourse, oral sex or masturbation."  None of the nudes are shown engaging in such acts, although they are nudes as defined in DOC Policy.

No evidence has been put forward to establish that the ban on this art book is reasonably related to a legitimate penological objective. Defendants' Motion for Summary Judgment in support of their banning the <u>Matisse</u> art book is denied.

This is not to say that all art books that are truly art books are as a group entitled to a free pass to be made available to all prisoners. The Court has visited many art galleries and art museums throughout the country and has probably the most comprehensive collection of modern fine art books in South Dakota. There are very few of those gallery and museum images and books where a case could be made for a banning based on the work being sexually explicit and the banning being reasonably related to a legitimate penological objective. But all of those images and books are not before the Court in this as applied analysis. This book and the Michelangelo Pictures and Sculpture are before the Court and no showing has been made that banning any of them is reasonably related to a legitimate penological objective.

## THE MICHELANGELO PICTURES AND SCULPTURES

The reproductions of Michelangelo's works depict portions of various scenes painted by Michelangelo in the Sistine Chapel, drawings for later paintings, or sculptures. One picture is of the sculpture of David from the Old Testament of the Bible. A life size reproduction of the sculpture is in a park in downtown Sioux Falls. Bare buttocks and bare unerect genitalia are visible in the picture. Not everyone gets to see what the genius Michelangelo painted in the Sistine Chapel even though the Court has. Everyone should have that opportunity at least through images. Defendants have denied any inquiry into their application of the stated exception for educational, medical, or anthropological purposes. As a result, in an as applied application, those exceptions do not in reality exist. No basis has been shown that the banning of the Michelangelo Pictures and Sculptures and the bronze by Ghiberti is reasonably related to a legitimate penological objective. The Defendants' Motion for Summary Judgment in support of banning Michelangelo is denied in support of this as applied analysis.

8

### THE EXCEPTIONS TO THE POLICY

There is an exception to the ban on publications containing nudity for nude material that is "illustrative of medical, educational or anthropological content." The exception is permissive, not mandatory, as it contains the word "may." That permissive element could be used where some art should nonetheless be kept out of prison. In briefing, Defendants claimed that the exception cannot apply to nudes that constitute art unless the inmate requesting the nudes is a "serious student of the arts." They urge that the exception is inapplicable to Plaintiff because Mr. Sisney is not in any art classes at SDSP. With that position there would have to be medical, educational, and anthropological classes available to inmates at the various prisons for inmates to take to possibly be awarded the exception. Defendants did not respond as to what, if any, instances there are where any of the exceptions were allowed. The three exceptions are illusory and are of no support to the defense of the DOC Policy.

### MISCELLANEOUS MATTERS

Mr. Sisney's due process arguments were previously dismissed by this Court and not pursued on appeal. Accordingly, they will not be dealt with again.

This Court reaches the same conclusions as the Report and Recommendation but cannot adopt the approach of the Report and Recommendation as it first determined that the DOC Policy was constitutionally deficient from a facial analysis. That facial analysis was then used in the as applied analysis. In this opinion on remand, the as applied analysis is the first analysis and stands on its own without regard to any conclusions from an application of a facial challenge. Also, the *King* policy is not relied upon other than to show how it differs from the 2014 DOC Policy in question and as one reasonable alternative.

Mr. Sisney urges that the DOC Policy is unconstitutionally vague. As the policy is in fact applied, it is not vague. The Court does adopt the discussion of vagueness at pages 91 through 93 of the Report and Recommendation (Doc. 105). The short answer is that the application of the DOC Policy in practice is that "feature" now means a one-time appearance of a single nude picture or a single sexually oriented passage in a publication, either of which will result in a banning of that

item.  Previously, "feature" was defined to mean a publication which routinely and regularly featured pornography or, in the case of one-time issues, promoted itself based on pornographic content.  Although the word "feature" remains in the current DOC Policy, there now is no definition of "feature."  Without any definition of "feature" or "features" it can be argued that the policy as stated is vague.  However, when considering the policy as applied, there is no vagueness to the current DOC Policy.

Defendants have argued that they need not show any basis for the much more stringent 2014 Policy as compared to the Policy approved by *King* in 2003, nor that they must separately show in this how the 2014 Policy meets the four *Turner* factors.  Defendants claim there the *King* decision allows Defendants to simply rely upon other cases and general statements.  *King* does not do so, as *King* was a situation where the Defendants moved for summary judgment and the *pro se* Plaintiff did not respond so the representations of the Defendants for summary judgment were admitted.

## THE FACIAL CHALLENGE

The Court has now ruled upon the as applied challenges.  Plaintiff also raised a facial challenge.  There is some question from the Complaint as to whether the facial challenge was a limited challenge or a challenge to all the pornography regulations.  Plaintiff was *pro se* until the appeal was taken so the Plaintiff's pleadings must be broadly construed.  In addition, throughout the proceedings before this Court the facial challenge has been to all of the pornographic regulation.

The courts can simultaneously consider an as applied as well as a facial challenge as was done in *Thornburgh*.  There the prison regulations for prisoner receipt of publications was found to be facially valid but the case was remanded for an individual determination of whether the regulation as applied in banning each of 46 publications was unconstitutional.

The first question is whether the facial challenge should be reviewed now that the as applied challenge has been ruled upon.  Footnote 5 of the Eighth Circuit Opinion in *Sisney* noted "*See* Richard H. Falcon, Jr*., Fact and Fiction about Facial Challenges*, 99 Cal. L. Rev. 915, 925 (2011) (noting that "the Supreme Court routinely speaks of facial attacks on particular provisions . . . . even

10

when the success of those attacks could have other aspects of multi part enactments [or rules] intact"). This was in support of the Court's observation: "Moreover, even if the as applied analyses did not fully resolve the case, the *Fox* approach might facilitate the severing of constitutionally suspect provisions instead of invalidating the entire policy." *Sisney* at 698.[1]

With those observations in mind, the pornography policy presents two different worlds. One is the prohibition of "sexually-explicit" conduct in the paragraph with the heading "Pornographic materials:" and the paragraph banning "Sexually Explicit:" with deletion of the words "nudity or." Sexually explicit conduct is far removed from simple nudity.

As for sexually explicit materials with the removal of nudity from the definition of sexually explicit, it is clear that such a banning has a reasonable relation to legitimate penological interests. As for the factors underlying that ultimate *Turner* test, the government objective underlying that portion of the regulations is legitimate and neutral, and that portion of the regulations is rationally related to that government objective only with the removal of nudity from the definitions of pornographic material and what is sexually explicit. Without those deletions, the policy is overly broad and in violation of the First Amendment. The same is true for a banning of a written publication that has a single sexual reference.

Secondly, there are no real alternate means of exercising the right to view simple nudity or to read literature that did not feature sexual presentations. There could be monitored reading rooms for such material but to provide that option is within the judgment and discretion of prison administrators and not to be mandated by the courts.

---

[1] *Sisney* at 698 referred to *Jacobsen v. Howard,* 109 F.3d 1268 (8th Cir. 1997). That commercial case involved the removal of Mr. Jacobsen's newspaper vending machines at highway rest areas. The as applied analysis found the statutes prohibiting this commercial activity at highway rest stops to violate the First Amendment so no review of facial challenge was necessary. In the present case, some of the bannings were on as applied analysis found to be constitutionally prohibited but other bannings were found to withstand First Amendment challenge. Those various findings warrant a *Fox* facial review which results in portions of the policy being upheld and portions stricken.

Thirdly, accommodating all prisoners to view and possess sexually explicit materials would appear to be detrimental to the order desirable for prison employees and other inmates. But once again, to ban simple nudity, or a single sexual reference in a publication is overly broad and contrary to the First Amendment.

Finally, a limitation upon viewing and possessing sexually explicit materials by inmates is not an exaggerated response to prison concerns. But the policy, both as stated and as applied, is far broader than that and is overly broad and in violation of the First Amendment.

What then about depictions of simple nudity that is not sexually explicit? The regulations banning simple nudity which has no component of being sexually explicit as defined by the policy, has no reasonable relation to any legitimate penological interests. A caveat is demonstrated by the Coppertone® ad. A limitation on nudity of minors would have a reasonable relation to legitimate penological interests.

Secondly, there is no reasonable alternative means of exercising the right to view simple nudity.

Thirdly, the impact of the accommodation of Plaintiff to view simple nudity would have no discernable impact upon others inside the prison such as guards and inmates.

Finally, the banning of simple nudity, nudity which has no component of being sexually explicit, is an exaggerated response to prison concerns.

But what about the written word? The *King* policy did not ban written material. It is a huge leap for the current policy to ban written material with sexual content where the sexual content is a natural part of the written work as opposed to sexual material being the feature of the publication. The present policy bans written material with any sexual content. That means the potential of banning the Bible and much of Shakespeare, not to mention all of the fiction of John Updike, Phillip Roth, Earnest Hemingway, and Gabriel Garcia Marquez, to name a few.

A ban this sweeping has no rational relation to legitimate penological interests. The prisoners have no alternate reasonable means of access to such literature.

The accommodation of the prisoners having access to these written materials would have little impact on others inside the prison. A more nuanced ban on some types of reading material is an easy alternative. A ban this sweeping is an exaggerated response to prison concerns.

Accordingly, that portion of the policy that includes in the definition of "Pornographic Material" the words "nudity or" is overly broad and in violation of the First Amendment. The sentence that remains which does not violate the First Amendment would read:

**Pornographic Material:**
Includes books, articles, pamphlets, magazines, periodicals, or any other publications or materials that feature "sexually explicit" conduct. Pornographic material may also include books, pamphlets, magazines, periodicals or other publications or material that features photographs, drawings, etchings, paintings, or other graphic depictions of sexually explicit material. "Feature" means a publication which routinely and regularly featured pornography, or in the case of one-time issues, promoted itself based on pornographic content. Graphic depictions of nudity of minors is prohibited.

The words "nudity or" would also be removed from the definition of "Sexually Explicit" as being overly broad and not reasonably related to legitimate penological interests.

One person cannot normally sue on behalf of others. An exception to the rule is a challenge to a statute as overbroad under the First Amendment. *LAPD v. United Reporting Pub. Corp.*, 528 U.S. 32, 38 (1999). "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial jurisdiction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Here there is no assumption necessary as the record contains numerous examples of banning materials of inmates other than Mr. Sisney.

Facial challenges have been found to be appropriate where, as here, the challenge provides actual instances of overbroad application of a policy, and not just speculation about hypothetical or

imaginary cases. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-450 (2008).

If a facial analysis of the pornography policy is not allowed, then that leaves the policy as virtually unreviewable. *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1320 (Fed Cir. 2002). Few inmates can navigate the rigors of federal litigation *pro se*, and Mr. Sisney has had able court-appointed counsel starting with his appeal.

The above alteration of the current policy allows that which should remain to be in place until the DOC creates whatever in its discretion it chooses, subject to the requirements of the First Amendment and the anticipated appeal.

The failure of the Defendants to support or justify the 2014 Policy should not be a basis for the courts refusing to do a facial review of the policy. If a refusal to justify a policy prevents facial review of claimed First Amendment violations, then there is a new and unbeatable defense to any facial review of a policy no matter how overbroad.

Unconstitutional applications of the current policy do overwhelm legitimate applications. By upholding the legitimate portions of the policy, the balancing of improper banning versus proper need not be made prospectively.

It should also be noted what this facial review does not do. It does not consider the instances of banning for violence which was approved in *Murchison v. Rogers*, 779 F.3d 882 (8th Cir. 2015) "... an overbreadth claim is unique from traditional facial challenges in that it does not require a plaintiff to plead or prove that the law is unconstitutional in every application." *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012) (citing *United States v. Stevens*, 559 U.S. 460, 130 S.Ct. 1577, 1587 (2020). Instead, Sisney needs to show that the policy's overbreadth is "real [and] substantial ... judged in relation to the [policy's] plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. at 615. The Penthouse type magazines are clearly to be banned in prison, but the potential banning of much of contemporary fiction is an overbreadth reach of the policy, for beyond its legitimate sweep.

14

Sisney has shown "'From the test of [the policy] and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003). "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreath grounds." *Members of City Counsel v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Sisney has shown actual and substantial overbroad application of the current policy occurring on a regular basis before and during this lawsuit (and continuing, see *Bell v. Young*, 2018 WL 314385 (2018)). The policy is overbroad and goes far beyond what is necessary. There were no "limiting constructions" offered by the Defendants for the Court to consider. See *Kolender v. Lawson*, 461 U.S. 352, 355 (1983).

In addition, this Court should, if possible, interpret the statute to preserve its constitutionality. *Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 ("' partial, rather than facial, invalidation is the required course,' such that a 'statute may ... be declared invalid to the extent that it reaches too far, but otherwise left intact'"). It should do so if the policy is "readily susceptible" to such interpretation. If it is not, the court should "not rewrite [the policy] to conform to the constitutional requirements. *Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 397 (1988).

Sisney urges that the entire policy should be invalidated. The first basis is the policy would not have been passed without the unconstitutional portions. Given that the previous *King* policy did not have the present unconstitutional portions, it seems likely the DOC would have passed something similar to the current policy without the unconstitutional portions as that policy is still more restrictive than *King*. Sisney also relies upon the fact that in its previous opinion, this Court declined to separate out or provide an alternative other than noting the existence of the previous *King* policy which had met constitutional challenge. Upon consideration of the Eighth Circuit Opinion, it appears that a couple of simple excisions and a provision regarding minors saved the policy by it now having a reasonable relation to legitimate penological interests and still being more restrictive in some aspects than the previous *King* policy.

IT IS ORDERED:

1.      That Defendants' Motion for Summary Judgment, Doc. 67, is granted in part

and denied in part as follows:

a.     Defendants' Motion for Summary Judgment on Mr. Sisney's as applied challenge is granted as to the Manga Comics <u>Pretty Face</u> books and granted as to the Coppertone® advertisement.

b.     Defendants' Motion for Summary Judgment on Mr. Sisney's as applied challenge is denied as to the <u>Thrones of Desire</u> book, the <u>Pride and Prejudice: The Wild and Wanton Edition</u> book, the Michelangelo pictures, and <u>Matisse Picasso and Modern Art in Paris;</u> and

c.     Defendants' Motion for Summary Judgment on Mr. Sisney's facial challenge is denied in part and granted in part. "Pornographic Material:" is found to withstand facial challenge with the removal of "nudity or" from the definition and "Sexually Explicit" withstands facial challenge with the removal of "nudity or". "Nudity:" as defined as a basis for banning is unconstitutional as being too broad as is the ban upon all written material that has any sexual content. The following is added to save the policy: "Featured: is defined as a publication which routinely and regularly featured pornography, or in the case of one-time issues, promoted itself based on pornographic content. The depiction of nudity of minors is prohibited."

2.     That Plaintiff Charles Sisney's Motion for Summary Judgment, Doc. 92, is granted in part and denied in part as follows:

a.     Mr. Sisney's Motion for Summary Judgment on his as applied challenge is denied as to the Coppertone® advertisement and denied as to the <u>Pretty Face</u> Manga comic books.

b.     Mr. Sisney's Motion for Summary Judgment on his as applied challenge is granted as to the <u>Thrones of Desire</u> book, the <u>Pride and Prejudice: The Wild and Wanton Edition</u> book; the Michelangelo pictures, and <u>Matisse, Picasso and Modern Art in Paris</u> book.

c.     Mr. Sisney's Motion for Summary Judgment on his facial challenge is granted in part and denied in part as is stated in <u>1.c.</u> above. No opinion is stated as to the effect of the current policy on outgoing mail as that question is not now properly

16

before the Court.

Dated this 29th day of June, 2020.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

17